**DISH NETWORK CORPORATION, a Nevada corporation, and dish network, LLC, a Colorado limited liability company, Plaintiffs–Appellants,**

v.

**Christopher M. ALTOMARI, Defendant–Appellee.**

No. 08CA1741.

Colorado Court of Appeals, Div. I.

June 25, 2009.

Brownstein Hyatt Farber Schreck, LLP, Richard P. Barkley, Meghan W. Martinez, Joshua S. Glasgow, Denver, Colorado, for Plaintiffs–Appellants.

Davis Graham & Stubbs, LLP, David R. Hammond, Stephanie A. Ries, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge TAUBMAN.

In this dispute over the enforceability of a covenant not to compete, plaintiffs, DISH Network Corporation and DISH Network, L.L.C. (collectively, DISH), appeal the trial court's order partially denying a motion for a preliminary injunction against a former employee, defendant, Christopher M. Altomari. Because we conclude the trial court erred in concluding Altomari was not "management personnel" within the meaning of an exception to Colorado's statute voiding covenants not to compete, section 8–2–113(2), C.R.S. 2008, we reverse and remand.

## I. Background

Altomari was hired to be the Commercial Director at DISH in December 2007. As part of his compensation package, he elected to receive a stock option and voluntarily entered into two stock option agreements, which contained this covenant not to compete (covenant):

> (a) ... Employee hereby agrees not to compete with the Company, and agrees to protect from disclosure certain information, pursuant to the terms and conditions hereinafter set forth. The covenant not to compete shall have a term beginning on the date hereof and ending on the date that ... is one (1) year after the date of the termination of Employee's employment with the Company at employee's current level (i.e., senior executive, vice president,

> director, manager, or other level held by Employee on the date of this Agreement) for any reason whatsoever.... Since the Company's business encompasses the entire continental United States, Employee acknowledges and agrees that the foregoing covenant is reasonable given the Company's current and future business plans.

> (b) Employee agrees that during the term of said covenant he or she shall not assist or directly or indirectly provide services to the continental United States business of any person or entity which is at the time of such assistance or provision a "Competitor" of the Company.... The term "Competitor" includes ... (ii) The DIRECTV Group, Inc....

> (c) Employee further agrees to hold in a fiduciary capacity for the benefit of the Company all proprietary and confidential information, knowledge, ideas and data, including, without limitation, customer lists and the Company's products, processes and programs ("Confidential Information") relating in any way to the present or future business or activities of the Company for as long as such Confidential Information remains confidential.... If any court of competent jurisdiction shall determine that the foregoing covenants are invalid in any respect, the parties hereto agree that any court so holding may limit such covenant in time, in area or in any other manner which the court determines such that the covenant shall be enforceable against Employee. Employee acknowledges that the remedy at law for any breach of the foregoing covenants will be inadequate, and that the Company shall be entitled, in addition to any remedy at law, to preliminary and permanent injunctive relief.

In July 2008, Altomari decided to leave DISH to work at its largest competitor, DirecTV, as a Senior Director of Field Operations. On July 10, 2008, Altomari told DISH he was leaving.

On July 23, 2008, DISH filed a verified complaint and motion to enjoin Altomari from working at DirecTV based upon the covenant. After a preliminary injunction hearing, the trial court partially granted the motion and determined that the covenant's

section (c) and the confidentiality provisions in section (a) entitled DISH to an injunction against Altomari from disclosure of any of DISH's confidential information. It otherwise denied the motion and refused to enjoin Altomari after concluding section (b) and the portions of section (a) that pertain to competition were unenforceable.

DISH appeals the order and seeks entry of a preliminary injunction against Altomari from working for DirecTV, or any other company identified in the covenant, until July 10, 2009.

## II. Validity of Covenant Not to Compete

DISH contends that the trial court abused its discretion in denying its motion for a preliminary injunction against Altomari and in holding the covenant not to compete void because its decision was based on an erroneous statutory interpretation. We agree.

■ We review a trial court's decision to grant or deny a preliminary injunction for abuse of discretion and will reverse if it is based on an erroneous application of the law, or is otherwise manifestly arbitrary, unreasonable, or unfair. *Phoenix Capital, Inc. v. Dowell,* 176 P.3d 835, 840 (Colo.App.2007).

The determination to grant or deny a preliminary injunction depends upon the trial court's consideration of the factors set forth in *Rathke v. MacFarlane,* 648 P.2d 648 (Colo. 1982).

Here, the trial court determined the only *Rathke* factors at issue were (a) whether DISH had a substantial likelihood of success on the merits; (b) whether the balancing of the equities favored an injunction; and (c) whether an injunction was consistent with the public interest. *See* 648 P.2d at 653–54. The trial court determined that the other factors favored entry of the injunction.

In determining whether there was a substantial likelihood of success, we address DISH's contention that Altomari was "management personnel" and thus subject to an exception in Colorado's statute prohibiting covenants not to compete, section 8–2–113(2).

### A. Executive and Management Personnel Exception

■ DISH and Altomari dispute the definition of "management personnel" within the meaning of section 8–2–113(2)(d), C.R.S.2008.

That statute provides:

(2) Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:

. . .

(d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

DISH argues that the trial court erred in finding the covenant void because it did not apply the plain language of the statutory exception for executive and management personnel. DISH further maintains that a manager is management personnel, while Altomari argues that the term "management personnel" applies only to employees who are "in charge," "act in an unsupervised capacity," and are the "few executives at the very highest echelons of a company." We agree with DISH and view executive and management personnel as two separate categories of employees. We reject Altomari's assertion that "executive and management personnel" has a judicially defined meaning that applies here.

■ Whether an employee is executive or management personnel is ordinarily a question of fact for the trial court, and we will not disturb its finding unless it is so clearly erroneous as to find no support in the record. *Phoenix Capital,* 176 P.3d at 841. This standard of review, however, is premised on the trial court's correct application of the law, which we review de novo. *Id.; see also Klinger v. Adams County School Dist. No. 50,* 130 P.3d 1027, 1031 (Colo.2006) (statutory interpretation is a question of law).

■ In interpreting a statute, we must give effect to the legislative intent. *Klinger,* 130 P.3d at 1031. To effect legislative intent, we first look to the statute's language and

construe words and phrases according to their common usage unless they have acquired a technical or particular meaning, whether by legislative definition or otherwise. § 2–4–101, C.R.S.2008; *Klinger*, 130 P.3d at 1031; *see also Bd. of County Comm'rs v. Roberts*, 159 P.3d 800, 804 (Colo. App.2006) (the plain and ordinary meanings of words, when read in context, should be construed literally according to common usages).

■ When the language is clear and unambiguous, we do not resort to other rules of statutory construction. *Klinger*, 130 P.3d at 1031; *Roberts*, 159 P.3d at 804. We avoid giving a forced, subtle, strained, or unusual interpretation where the language is plain, the meaning is clear, and no absurdity is involved. *Harding v. Indus. Comm'n*, 183 Colo. 52, 59, 515 P.2d 95, 98 (1973).

■ Further, appellate courts may determine the meaning of undefined statutory words by referring to the dictionary. *People v. Thoro Prods. Co.*, 70 P.3d 1188, 1194 (Colo. 2003).

As relevant here, the statutory prohibition on covenants not to compete does not apply to "management personnel." § 8–2–113(2)(d). However, there is no legislative definition of "management personnel." *See Phoenix Capital*, 176 P.3d at 841–42 (because there was no legislative definition of "employees who constitute professional staff to executive and management personnel," the division applied the plain meaning of the phrase). Further, "[t]he Colorado Supreme Court has not considered this exception, and the other courts that have considered the exception have not provided a clear definition for who qualifies as 'executive and management personnel.'" John R. Paddock, Jr., *Colo. Prac., Employment Law & Practice* § 5.23 (2d ed.2005).

After the preliminary injunction hearing the trial court made the following findings concerning whether Altomari was "management personnel": Altomari was the only director, out of nine directors employed by DISH to perform installation and service work, who worked on the commercial side of DISH's business, which was approximately five percent of the business and was a

"growth area." He directly supervised fifty out of DISH's 22,000 employees. Although he was several layers under the CEO, he was at the top level of compensation "and at least at the start of the decision-making level." Altomari "had to go through a lot of hoops to get authority to do many, many things, but there was a certain amount of autonomy that [he] was allowed."

The trial court determined that Altomari "was a mid-level manager at best," but he "definitely had management responsibilities." Nevertheless, the trial court concluded that Altomari was not the type of manager who triggered the statutory exception. Thus, it held that the noncompete covenant violated section 8–2–113(2) and was void.

"Management" and "personnel" are ordinary words of common usage that have unambiguous meanings. "Personnel" means a body of persons employed in some service, such as an office. *Webster's Third New International Dictionary* 1687 (2002). "Management" has been defined as the conducting or supervising of something, such as a business. *Id.* at 1372. Thus, persons who conduct or supervise a business would be considered "management personnel."

This term undoubtedly encompasses "key personnel," employees who are "in charge," those at "the heart of the business," and "those few executives at the highest echelons of a company" as the trial court found. However, to exclude from the definition of "management personnel" those managers like Altomari who "direct, control, and supervise" approximately fifty people nationwide in a division of a business with a ten million dollar budget, inappropriately narrows the statutory language and is inconsistent with the plain language of the statute.

Therefore, we conclude that the trial court erred in limiting the phrase "management personnel" to "key personnel at the heart of a business" and thus incorrectly applied the law to the facts.

Relying on *Harrison v. Albright*, 40 Colo. App. 227, 577 P.2d 302 (1977); *Porter Industries, Inc. v. Higgins*, 680 P.2d 1339 (Colo. App.1984); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789 (Colo.App.2001),

abrogated in part on other grounds by In-gold v. AIMCO/Bluffs, L.L.C. Apartments, 159 P.3d 116, 124 (Colo.2007); and Double-click Inc. v. Paikin, 402 F.Supp.2d 1251 (D.Colo.2005), the trial court concluded that the case law required it to "look at whether [Altomari] acts autonomously, is the key man and is in charge of and constitutes the heart of [DISH's] business."

We conclude these decisions are distinguishable because they did not interpret the plain language of section 8–2–113(2)(d).

In *Harrison*, a division of this court affirmed a trial court's order granting a preliminary injunction against an electrical contracting employee after he violated a noncompete clause in a contract with his business partner. *Harrison*, 40 Colo.App. at 228, 577 P.2d at 303. The trial court found that one partner provided the financial backing, while the other, the employee-defendant, was "the only person who possessed the knowledge, skills, and the licenses to make the business a possible success." *Id.* at 231, 577 P.2d at 304. Thus, he was "the key man and very heart of the business" and, as such an essential employee, he was executive and management personnel. *Id.*

In *Harrison*, the division reviewed the trial court's determination that in those circumstances, the executive and management personnel exception applied to the employee. The language of "key [personnel]" and "heart of the business" described the employee-defendant. Although the division did not address whether he was executive or management personnel, his role as one of two business partners would appear to have constituted an executive position. Further, nothing in *Harrison* limited the exception's application to *only* key personnel at the heart of a business. Such a strained definition does not give effect to plain language of the exception. Further, the division did not interpret the statute to define "executive and management personnel."

In *Porter Industries*, a division of this court affirmed the trial court's denial of a motion for preliminary injunction against a former employee who stated that he intended to "rescind" a noncompete clause and solicit

the former employer's customers. 680 P.2d at 1341. There, applying the clear error standard to the trial court's factual findings, the division concluded that the record showed that the employee was "a company representative" and a salesman who negotiated and sold contracts, made sales calls, and promoted the business. *Id.* at 1342. Because he was not in charge of existing contracts and did not act in an unsupervised capacity, the division upheld the trial court's determination that he was not executive and management personnel. *Id.*

Again, the *Porter Industries* division did not engage in statutory interpretation. It did not indicate that the employee supervised others or acted in a managerial function, but instead relied on the employee's lack of unsupervised activities. Here, in contrast, the trial court found that Altomari "definitely had management responsibilities, including supervision of fifty DISH employees throughout the country."

In *Atmel*, relying on *Porter Industries*, the division stated that the "management personnel exception applies to those employees who are 'in charge' of the business and who act in an unsupervised manner." 30 P.3d at 794. The division reversed the trial court's finding that the management personnel exception applied to an employee who was considered a "technical liaison" because he did not supervise or manage anyone and had three levels of management above him. *Id.* at 795.

The *Atmel* division did not interpret the statute, but reversed, concluding that the trial court's factual finding that the employee held a "management position" was clearly erroneous. The *Atmel* division noted that the employee "did not supervise or manage anyone," *id.*, whereas here, Altomari supervised others and the trial court found that he acted in a managerial capacity.

Finally, the trial court relied on *Double-click*, 402 F.Supp.2d 1251. There, the trial court granted the employer's motion for a preliminary injunction and enforced a covenant not to compete against an employee who was a senior vice president. *Id.* at 1261. Focusing on the job responsibilities rather than job titles, the court concluded the em-

ployee was management personnel because she supervised approximately fifty employees, was in charge of a significant part of the company's business, and was partially involved in setting company strategy. More significant, the court did not rely on Colorado state cases holding that management personnel under the statute must be key personnel at the heart of the business. *Id.* at 1258–59. Thus, the *Doubleclick* court applied a fact-specific analysis consistent with the language of section 8–2–113(2)(d).

Accordingly, we conclude the trial court here erred in relying on selective phrases in decisions that simply applied section 8–2–113(2)(d) to the facts, without engaging in statutory interpretation of the term "management personnel."

In conclusion, because the General Assembly did not define "management personnel," we hold that the plain meaning of the term applies. Had the General Assembly intended to limit section 8–2–113 to key personnel at the heart of the business, it could have easily done so by defining the term or using different language. *See* § 10–7–604(1)(b), (d), (i), C.R.S.2008 (the General Assembly demonstrated intent to limit applicability of statute to those at the highest echelons of a company by using the phrase "officers, partners, members, or key management personnel"); *Southard v. Miles,* 714 P.2d 891, 898–99 (Colo.1986) (supreme court construed statute by reference to similar phrase in unrelated statute).

■ Nevertheless, Altomari suggests that we apply the technical meaning used by the courts in the prior cases. However, technical meanings refer to terms with a unique definition within a specific industry, or to legal terms of art. *See, e.g., Wash. County Bd. of Equalization v. Petron Dev. Co.,* 109 P.3d 146, 153–54 n. 15 (Colo.2005) ("wellhead" has technical meaning in oil and gas industry); *Armentrout v. FMC Corp.,* 842 P.2d 175 (Colo.1992) ("defective" has technical meaning in product liability cases); *People v. Macrander,* 828 P.2d 234, 240–41 (Colo.1992) ("attorney of record" is a legal term of art). Nothing in the record or the statute suggests that "management personnel" has a technical

meaning as a word of art in its field that may conflict with its common usage.

In sum, we conclude that because the trial court found Altomari to be a mid-level manager who supervised fifty employees, was otherwise at the top of the compensation scheme, was employed in a decision-making capacity, and had a certain level of autonomy, he was "management personnel" under section 8–2–113(2)(d).

Accordingly, we determine that the covenant was not void and could be applied to Altomari.

### B. Trade Secrets Exception

Because we have concluded that the executive and management exception applied so that the covenant could be enforced against Altomari, it is unnecessary to determine whether the trade secrets exception also applied. *See* § 8–2–113(2)(b), C.R.S.2008.

### III. Reasonableness Findings

DISH next contends that the trial court erred in determining the duration of the covenant was unreasonable. We decline to address this contention.

■ When a noncompete clause is otherwise valid under section 8–2–113(2), it must also be reasonable in duration and geographic scope to be enforceable. *Reed Mill & Lumber Co. v. Jensen,* 165 P.3d 733, 736 (Colo.App.2006); *National Graphics Co. v. Dilley,* 681 P.2d 546, 547 (Colo.App.1984).

The trial court refused to reform the agreement. It found (1) that the geographic scope of the agreement was reasonable because DISH is a nationwide company, and (2) that the combination of the national scope and one-year duration was unreasonable because Altomari had only worked at DISH for six months. The trial court reasoned that prohibiting him from working in this "giant industry for a period twice the time he spent at DISH Network seem[ed] a little unequal."

Because DISH has requested entry of a preliminary injunction until July 10, 2009, a date which is fast approaching, the trial court would not have sufficient time to reconsider the reasonableness of the covenant's duration

if we were to decide this issue in favor of DISH.

 Accordingly, we decline to address this contention. Instead, on remand, if DISH seeks a permanent injunction, the trial court must consider the factors set forth in *Langlois v. Board of County Commissioners*, 78 P.3d 1154 (Colo.App.2003) (requirements for a permanent injunction are similar to those for a preliminary injunction). Thus, it will have to reconsider the balancing of the equities and the public interest. 78 P.3d at 1158.

### IV. Conclusion

Because we have concluded above that the covenant was enforceable, the trial court erred in determining that DISH was not likely to succeed on the merits.

Thus, the trial court's order partially denying the preliminary injunction as to section (b) and the competition portions of section (a) of the covenant not to compete is reversed. The case is remanded to the trial court for further proceedings, as appropriate, consistent with this opinion.

Judge ROY and Judge GABRIEL concur.