**SHEEP MOUNTAIN ALLIANCE,**
Plaintiff–Appellant,

v.

**BOARD OF COUNTY COMMISSIONERS, MONTROSE COUNTY, Colorado, Defendant–Appellee,**

and

**Steve White, in his official capacity as Montrose County Land Use Director,** Defendant–Appellee and Intervenor,

and

**Energy Fuels Resources Corporation,** Appellee.

No. 11CA0588.

Colorado Court of Appeals, Div. I.

Dec. 8, 2011.

Travis Stills, Durango, Colorado, for Plaintiff–Appellant.

Robert J. Hill, Montrose, Colorado, for Defendant–Appellee and Defendant–Appellee and Intervenor.

Mathis and Associates, P.C., Stephen M. Mathis, Montrose, Colorado, for Appellee.

Opinion by Judge TAUBMAN.

Plaintiff, Sheep Mountain Alliance (SMA), appeals the judgment denying its request for relief under C.R.C.P. 106(a)(4) from a resolu-

tion of the defendant, Montrose County Board of County Commissioners (Board), conditionally granting Energy Fuels Resources Corporation (Energy Fuels) a special use permit (SUP) to operate a uranium and vanadium mill and tailings disposal facility within the county. We affirm.

## I. Background

In March 2008, Energy Fuels publicly introduced its plan to construct a uranium and vanadium ore processing mill and disposal facility in the Paradox Valley in southwestern Colorado. It then filed an application with the Board in July 2008 to construct and operate this facility, the Piñon Ridge Project, as a special use within the general agricultural district in which the project was to be located.

Due to mounting concerns regarding water availability to operate the proposed mill, the county hired an independent engineering consultant to review and opine on Energy Fuels' hydrology data. In March 2009, the consultant reported to defendant, Steve White, the county planner, that the proposed wells would fall "pitifully short" of the water supply needed for full operation of the project.

In response, Energy Fuels procured a commitment from the nearby town of Naturita for additional water rights, planned to construct two additional wells in the vicinity of the mill, and amended its application to halve its daily processing rate from 1000 tons per day (tpd) of ore to 500 tpd. In May 2009, the consultant submitted to White a new opinion based on review of these changes that water quantity and quality would be sufficient for operation of the mill at 500 tpd of ore.

White issued a staff report on Energy Fuels' application to the Planning Commission in May 2009, advising it that the Piòon Ridge Project constituted a permissible special use as a "new mineral resource development and extraction operation and facility" under the Montrose County Zoning Resolu-

tion (Zoning Resolution). The Planning Commission and the West End Planning Advisory Committee then publicly noticed and held joint public hearings[1] on Energy Fuels' application on May 19, June 10, and July 1, 2009. At the joint hearings, White testified in support of the Planning Commission's staff report. Numerous interested citizens also testified, including members and representatives of SMA, a citizens organization committed to preserving southwest Colorado's resources and natural environment. The hearings were recorded in their entirety, and minutes were kept.

Consistent with discussions at the hearings, White revised his staff report and added sixteen conditions, some of which SMA helped draft. On July 1, 2009, the Planning Commission voted to recommend approving Energy Fuels' SUP with these conditions.

After receiving the staff report advising it of the Planning Commission's recommendations, on August 13 and September 9, 2009, the Board held two public hearings on the application, at which it heard public comment and testimony by White, Energy Fuels, and others. The Board then closed the public hearing but advised the public it could submit written comments until a final decision was made.

On September 28, 2009, the Board held a work session to discuss the application with county staff. The meeting was noticed and open for public observation, but not the taking of testimony from members of the public.

On September 30, the Board approved Resolution No. 98–2009, granting Energy Fuels a SUP to construct and operate the Piñon Ridge Project, conditioned upon Energy Fuels' compliance with nineteen enumerated conditions.

SMA sought review of the Board's decision under C.R.C.P. 106(a)(4). In a thorough opinion, the trial court affirmed the decision. This appeal followed.

---

1. The Board refers to these multiple sessions together as one public hearing. However, we, like SMA and Energy Fuels, use the term "public hearing" more colloquially to refer to a single

meeting. Here, for example, there were three public hearings. Regardless, the terminology does not impact our analysis.

## II. Standard of Review

■ Under C.R.C.P. 106(a)(4), a trial court's review of an agency's judicial or quasi-judicial decision is "limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer." C.R.C.P. 106(4)(a)(I); *accord Van Sickle v. Boyes,* 797 P.2d 1267, 1272 (Colo.1990). Abuse of discretion has occurred if a decision is not reasonably supported by any competent evidence in the record, or if the agency has misconstrued or misapplied applicable law. *Freedom Colorado Info., Inc. v. El Paso County Sheriff's Dep't,* 196 P.3d 892, 900 (Colo.2008).

■ An agency's denial of due process in its exercise of quasi-judicial functions also may constitute an abuse of discretion. *Eason v. Bd. of County Comm'rs,* 70 P.3d 600, 609 (Colo.App.2003).

■ When we review an action under C.R.C.P. 106(a)(4), we review the decision of the administrative body, not that of the trial court. *Woods v. City & County of Denver,* 122 P.3d 1050, 1053 (Colo.App.2005).

■ Although we are not bound by an agency's construction of its own resolutions and ordinances because our review of such questions of law is de novo, we may defer to reasonable interpretations involving matters within the agency's area of expertise. *City of Commerce City v. Enclave W., Inc.,* 185 P.3d 174, 178 (Colo.2008).

■ Additionally, in interpreting local ordinances, we rely on the basic rules of statutory construction. *Id.* "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *People v. Tixier,* 207 P.3d 844, 847 (Colo.App.2008) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).

## III. Public Hearings

SMA contends the Board violated the Zoning Resolution, and therefore abused its discretion, because it did not record and prepare minutes of three separate public hearings relating to the SUP. Because we disagree that the Board held public hearings on the dates in question, we discern no such abuse of discretion.

Under the Zoning Resolution, before the Board may issue a SUP, the Planning Commission must first review the special use application and make written findings based on public testimony, staff recommendations, and certain criteria. Zoning Resolution § VI(B). Then, the Board "will review the application in a public hearing and, based on the evidence presented at the hearing" make findings approving or denying the requested permit. *Id.*

SMA relies on language in a different section of the Zoning Resolution to contend that the Board violated the Zoning Resolution's procedural requirements. Section C, regarding amendments to the Zoning Resolution, provides in relevant part:

> Hearing procedures shall be conducted with reasonable formality so as to provide for fair and reasonable testimony and other input by and interchange between all applicants, interested citizens (or other representatives), planning staff, and to accommodate full inquiry by members of the [Board]. *All public hearings shall be tape recorded and minutes of such hearings shall be prepared and made available to interested parties by staff.* Transcripts of public hearings or portions thereof may be requested at cost.

Zoning Resolution § VI(C)(2)(c)(2) (emphasis added). Although we note that section B does not contain this language, the parties agree, and we will assume, that it applies here. SMA contends that the Board did not record the minutes of one public hearing in March 2008 and two in September 2009 in violation of this section.

■ Initially, we disagree that the March 2008[2] meeting constituted a public hearing

---

**2.** SMA referred to the date of this alleged public hearing interchangeably in its opening brief as both March 25 and March 28. However, our

under the Zoning Resolution. The SUP process, in which the Planning Commission recommends a course of action and the Board thereafter holds a public hearing, commences with the filing of an application for a SUP. Here, Energy Fuels did not file its application until July 2008. Therefore, the Zoning Resolution's procedural mandates were not triggered until the application was filed.

SMA next contends an unrecorded public hearing occurred on September 15, 2009. However, the record does not support this contention. To the contrary, neither the Board's notice of workshops and meetings nor the Board's answer to SMA's original complaint establishes that a hearing concerning the SUP occurred. Therefore, we conclude that SMA has failed to show the Board violated the Zoning Resolution by not recording and preparing minutes of a September 15 meeting.

■ The Board admits, however, that it conducted a work session relating to the SUP on September 28. SMA contends that such a session constituted a public hearing because the Board reviewed Energy Fuels' application at that time and based its decision to approve the SUP in part on this review. *See* Zoning Resolution § VI(B) (the Board "will review the application in a public hearing and, based on evidence presented at the hearing," deny or grant the SUP). Thus, it contends, the Board abused its discretion in failing to record the work session.

Although the Zoning Resolution plainly requires the Board to hold *a* public hearing to review a SUP, contrary to SMA's contention, section VI(B) does not classify all public meetings regarding a SUP as public hearings, subject to recording. We must apply the canons of construction to discern whether a work session constitutes a public hearing under the Zoning Resolution.

We look first to the plain language of the terms "public hearing" and "work session." *See Enclave W.*, 185 P.3d at 178. However, the Zoning Resolution is silent as to the definition of either term.

The specific context in which the terms are used and the context of the ordinance as a whole guide our interpretation. *See Tixier*, 207 P.3d at 847. Review of a SUP application is to be "based on evidence presented at the [public] hearing," suggesting that a public hearing is evidentiary. Zoning Resolution § VI(B). As noted, section VI(C) provides that public hearings are to be conducted with "reasonable formality so as to provide for fair and reasonable testimony by and interchange between" applicants, interested citizens, and staff and "to accommodate full inquiry by members" of the Board.

Accordingly, we conclude the Board's September 28 work session was not a "public hearing" on Energy Fuels' SUP application. *See, e.g., Eudaly v. City of Colleyville*, 642 S.W.2d 75, 77 (Tex.App.1982) ("the term 'public hearing' contemplates the opening of the floor for public comment by anyone desiring to speak on the issue of concern"; thus, workshops held open for public observation but not for public comment were not public hearings). As described, the work session constituted an informal, deliberative session between staff and members of the Board. Although the session was announced in the Board's weekly notice of meetings and open to the public, the Board did not hear testimony from Energy Fuels or interested citizens. Nor was the purpose of the work session to gather evidence. *See also Einarsen v. City of Wheat Ridge*, 43 Colo.App. 232, 234, 604 P.2d 691, 693 (1979) (council deliberation on evidence already presented at public hearing in its "fact-finding session" did not violate public meetings law).

Therefore, we disagree with SMA that the Board violated the Zoning Resolution when it failed to record the minutes of the September 28 work session.

■ We also disagree with SMA's alternative contention that the Board's interpretation of the Zoning Resolution is inconsistent with Colorado's Open Meetings Law, sections 24–6–401 to –402, C.R.S.2011. *See, e.g., Bagby v. Sch. Dist. No. 1*, 186 Colo. 428, 434, 528 P.2d 1299, 1302 (1974) (statute is "remedial, designed [p]recisely to prevent the abuse of [secret] sessions of public bodies"). The proposition upon which SMA relies—that the

analysis is unaffected by any confusion this may have caused.

public policy of the Open Meetings Law is to minimize the occurrence of secret decision-making sessions—is inapposite here because the working session was open to the public.

### IV. Listed Special Use

 SMA next contends the Board abused its discretion in classifying the Piñon Ridge Project as an authorized, listed special use in a general agricultural district. We disagree.

The Zoning Resolution divides Montrose County into different "zone districts" based on their primary uses, ranging from general agricultural to heavy industrial districts. Zoning Resolution § IV. The Zoning Resolution lists certain uses either as "uses-by-right," "prohibited uses," or "special uses" within each zone district. *Id.* For any uses not listed in any of these three categories or "not clearly fitting within one or more categories," the county planner must determine and notify in writing the Planning Commission and the Board in what zone district(s) such uses are permitted. *Id.*

SMA contends the Board abused its discretion in granting Energy Fuels' application because its decision was based, in part, on White's determination that a uranium processing mill constituted a *listed* special use, and this determination was not adequately documented in the record.

However, section IV of the Zoning Resolution requires the county planner to make specified written findings only when he or she determines that a use is either not listed or not clearly fitting within a category within a specific zone district. Here, White concluded:

> The [Zoning Resolution] allows new mineral resource development and extraction operations and facilities as a Special Use in the General Agricultural District.... For this use the County Planner has determined that a uranium mill falls under the use criteria of a new mineral resource development and extraction operation and facility, which requires a special use permit.

Because he found Energy Fuels' proposed use was listed, he was not required to further document his finding under the Zoning Resolution.

 Nor do we find persuasive SMA's contention that the Board abused its discretion because it failed to adequately articulate the basis for its decision that Piñon Ridge clearly fits into the category of a listed special use. We are limited to overturning decisions of the Board that are not reasonably supported by competent evidence in the record, derive from a misconstruction of the law, or were made in violation of due process. *Freedom Colorado Info., Inc.,* 196 P.3d at 900. None of these circumstances existed here.

After White determined that the use was a listed use, the public had ample opportunity to comment on this determination at hearings before the Planning Commission and the Board and to request additional support for such a finding. Thus, we perceive no lack of due process.

Following the August 2009 public hearing, after the Board received comments both agreeing and disagreeing that Piñon Ridge could be categorized as a listed special use in a general agricultural district, it concluded that "the proposed uranium and vanadium mill as described in the [SUP] application is a new mineral resource development and extraction operation and facility as contemplated in Section IV(B)(3)(1) of the [Zoning Resolution]." We perceive competent evidence in the record to support the Board's decision.

We also conclude the Board's interpretation of a uranium and vanadium ore processing mill as a new mineral development operation was consistent with the plain language of the terms. *See City of Colorado Springs v. Securcare Self Storage, Inc.,* 10 P.3d 1244, 1249 (Colo.2000) (courts must construe words according to their ordinary meaning).

Because the Board's determination that this use constituted a listed use was based on evidence in the record and a reasonable interpretation of the terms, and was not the result of a procedural defect that denied due process, we discern no abuse of discretion.

### V. Hazardous Waste Disposal

■ SMA maintains the Board erred in granting Energy Fuels the conditional SUP because the Piñon Ridge Project involves the on-site disposal of hazardous waste in violation of the Zoning Resolution. Because we conclude that uranium and vanadium tailings from the proposed mill are not "hazardous waste" within the meaning of the Zoning Resolution, we disagree.

To support its contention that disposing hazardous waste within the county is prohibited, SMA relies on a provision of the Zoning Resolution permitting solid waste disposal or processing as a listed special use in general agricultural districts but "not including hazardous waste disposal." Zoning Resolution § IV(A)(3)(m). Although SMA also relies on provisions prohibiting hazardous waste disposal in light and heavy industrial districts, we conclude that only provisions concerning special uses in this general agricultural district are apposite. Neither the Board nor Energy Fuels challenges SMA's contention that the Zoning Resolution does not permit hazardous waste disposal facilities.

However, the parties differ as to whether a uranium and vanadium processing mill that produces and stores radioactive tailings constitutes a hazardous waste disposal facility. This issue is a matter of first impression in Colorado.

SMA contends that the tailings, replete with radionuclides, heavy metals, and toxic processing chemicals, are hazardous under the plain language and ordinary meaning of the word. *See Securcare Self Storage,* 10 P.3d at 1249 ("If courts can give effect to the ordinary meaning of words used by the legislature, the ordinance should be construed as written . . . ."). Therefore, it argues, the Board abused its discretion in permitting their disposal here.

■ In construing an ordinance, our goal is to give effect to the intent of the legislative body. *Id.* Accordingly, we must effectuate the ordinary meaning and usage of words, as well as "the commonly accepted technical or particular meaning" of words that have acquired such meanings. *People v. Rockwell,* 125 P.3d 410, 417 (Colo.2005);

*DISH Network Corp. v. Altomari,* 224 P.3d 362, 368 (Colo.App.2009) (technical meaning refers to terms with a unique definition within an industry or to legal terms of art); *see* § 2–4–101, C.R.S.2011. We generally presume that the legislature has knowledge of the legal import imparted by chosen words and phrases. *Rockwell,* 125 P.3d at 417 (acknowledging a clear meaning of the term "factual basis").

SMA contends that a member of the general public might consider radioactive uranium and vanadium tailings to be hazardous waste. The trial court also acknowledged that the drafters of the Zoning Resolution very well may have intended radioactive material to be within the category of hazardous waste. However, the trial court found, and we agree, that no evidence in the record indicated that the drafters of the Zoning Resolution intended this plain meaning to apply. Instead, the trial court concluded, as do we, that, as discussed below, we must give effect to the legal, technical meaning of the phrase "hazardous waste" in construing the Board's rules.

By its own terms, the Zoning Resolution restricts hazardous waste disposal in the specialized context of state solid waste laws. In section IV, the Zoning Resolution permits solid waste disposal as a special use in agricultural districts if approved pursuant to the solid waste disposal sites and facilities act, sections 30–20–100.5 to –123, C.R.S.2011, "not including hazardous waste disposal." Zoning Resolution § IV(A)(3)(m) (emphasis added). We endeavor to give effect to the term in this context, the cited statutory scheme. *See Tixier,* 207 P.3d at 847.

Under the act, county governments approve solid waste disposal facilities by granting certificates of designation. Within the statutory scheme, "hazardous waste disposal sites" may be approved if a certificate of designation is issued pursuant to article 15 of title 25, C.R.S. 2011. § 30–20–102.5, C.R.S. 2011. The Zoning Resolution expressly prohibits these certifiable hazardous waste disposal sites. However, the definition of "hazardous waste" in article 15 of title 25 "does not include . . . [s]ource, special nuclear, or by-product material as defined by the federal

'Atomic Energy Act of 1954' [AEA], as amended." § 25–15–101(6)(b)(II), C.R.S.2011.

AEA, 42 U.S.C. §§ 2011 et seq., defines "byproduct material" as "the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." 42 U.S.C. § 2014(e)(2). Such material is referred to as "11 e(2) material." Accordingly, uranium tailings are not "hazardous waste" that may be disposed of only at certifiable hazardous waste disposal sites.

Additionally, the county government is precluded from certifying "[m]aterials handled at facilities licensed pursuant to provisions on radiation control in article 11 of title 25, C.R.S." because such materials are excluded from the definition of "solid waste." § 30–20–101(6)(b)(V), C.R.S.2011. Rather, the Colorado Department of Public Health and Environment (CDPHE), the General Assembly, and the governor license proposed uranium mill, processing, or disposal facilities under article 11. §§ 25–11–201, 25–11–203, C.R.S.2011.

Thus, under the term's technical meaning, we conclude that tailings from the uranium processing are not included within the applicable definition of hazardous waste, the disposal of which is prohibited under section IV of the Zoning Resolution.

Our conclusion is further supported by decisions of the federal courts interpreting the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 et seq. (2011), the federal statute concerning solid waste disposal, storage, and treatment. *See United States v. Self,* 2 F.3d 1071, 1076 (10th Cir. 1993) ("for a waste to be classified as hazardous, it must first qualify as a solid waste" (quoting *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,* 989 F.2d 1305, 1313 (2d Cir.1993))); *New Mexico v. Watkins,* 969 F.2d 1122, 1131 (D.C.Cir.1992) (facilities handling AEA 11(e) material are exempt from RCRA because 11(e) material is not "solid waste" under 42 U.S.C. § 6903(27)). Because Colorado's statutes concerning hazardous waste disposal, §§ 25–15–101 to –515, C.R.S.2011, were derived from and intended to be similar to RCRA, and use language substantially similar to that

contained in RCRA, such authority is helpful. *People v. Thoro Products Co.,* 70 P.3d 1188, 1196 (Colo.2003), *aff'g* 45 P.3d 737, 741–42 (Colo.App.2001).

The record shows that the Board relied on this technical meaning of "hazardous waste" in interpreting its ordinance. In its resolution conditionally granting Energy Fuels the SUP, it solely permitted the generation and disposal of AEA "11e(2) by-product material." This condition originated, in part, from advice CDPHE staff provided to the Board, at its request, that uranium tailings were not solid or hazardous waste under relevant state statutes. E-mails communicating this interpretation to Energy Fuels and White are in the administrative record.

Thus, because the Board did not err in interpreting the ordinance and its decision was supported by competent evidence in the record, the Board did not abuse its discretion in concluding the proposed mill tailings do not constitute hazardous waste in this context.

## VI. Annualized Average Rate

■ Finally, SMA contends that the Board abused its discretion by permitting Energy Fuels to operate at a maximum annualized, as opposed to daily, average rate of processing ore. We disagree.

Before granting Energy Fuels' application, the Board added several conditions to the SUP in addition to those conditions recommended by the Planning Commission. Condition 18 prohibits the mill from operating in excess of a rate of 500 tpd of ore, averaged annually. It provides that Energy Fuels or the mill operator must seek an amendment of the SUP to operate at rates above this annual limit.

SMA first contends that adding this condition amounted to a procedural defect because the public had no opportunity to raise issues concerning the annualized average.

However, evidence in the record does not support this contention. At the September 30 hearing, White testified that county staff had received public comments "that averaged annually was not the best approach." He

also testified that the 500 tpd daily rate limit "was always indicated by the applicant [to be] averaged annually." In response, members of the Board testified that they believed the averaged annual rate was "acceptable" and not materially different from a maximum daily processing rate. Thus, the Board considered but rejected the concerns that an annualized average rate was inappropriate.

Nor are we persuaded that adding Condition 18 after the Board had closed the fact-finding portion of the public hearing was in violation of the Zoning Resolution. The Board was required "to review the application in a public hearing and, based on evidence presented at the hearing, make findings ... approving with conditions ... the special use." We do not interpret the ordinance as prohibiting the Board from adding conditions to the SUP after it has closed the public hearing.

█ In any event, SMA has not shown how it was prejudiced by the alleged procedural defect. "The harmless error rule applies to judicial review of administrative proceedings, and errors in such administrative proceedings will not require reversal unless [p]laintiffs can show they were prejudiced." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir.1993); *accord New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir.2009).

SMA alleges the annualized scheme "emerged from" the unrecorded September 28 work session, and was neither open to public comment nor openly considered by the Board. However, the September 28 work session was open to the public, and thus, SMA's members were not precluded from attending or hearing about Condition 18 if it had originated therein. Additionally, the Board advised the public that it would, and did, accept comments regarding the SUP until it finalized its decision. Because it is conceivable that SMA could have commented on the average annualized rate, but has not alleged that this issue was actually discussed at the September 25 work session, we conclude SMA has not met its burden to show that it was prejudiced. Thus, any procedural defect was harmless.

SMA also contends that the Board abused its discretion because the record fails to support its conclusion that an adequate water supply exists to support the mill's processing 500 tpd of ore averaged annually.

It is undisputed that the adequacy of the water supply was an important factor the Board considered before approving Energy Fuels' application. Indeed, Energy Fuels reduced its proposed daily operating rate to 500 tpd in its amended application to allay the county's concerns that insufficient quantities of groundwater were available. The Board also concedes that annualizing the processing rate permits the mill to operate some days over 500 tpd, even up to the mill's maximum daily capacity of 1000 tpd.

However, according to the Board, the mill will also be required under this scheme to operate below 500 tpd "for at least an equal period of time." Therefore, as stated at the September 30 hearing, "whether that activity occurs on an average basis based on actual tonnage or not, the same activity is going to occur and use the same resources ... to facilitate the process." Such "resources" reasonably include water to operate the mill. Accordingly, we disagree with SMA that *no* findings or determinations in the record justify adoption of this annual averaging scheme.

We also disagree that the record is devoid of other competent evidence that reasonably supports the Board's decision despite concerns regarding adequate water supply. After Energy Fuels amended its application and procured additional water supplies, the county's engineering consultant opined that a sufficient quantity of water could be developed to support the operation. Conversely, SMA cites no data that suggests this decision will negatively affect the annual water supply. *See also Bar MK Ranches*, 994 F.2d at 740 (failure to show prejudice amounts to harmless error).

Finally, the Board conditioned the SUP application on numerous other safeguards to ensure adequate water supply in quantity and quality. Conditions 11 and 8, respectively, require Energy Fuels to obtain and maintain adequate water sources prior to construction of the mill and to report to the

Board regarding water sources. Condition 13 requires extensive water monitoring. Condition 14 makes Energy Fuels liable for any damages and mitigation if its operations impact other beneficial water users in the county. Finally, Condition 16 requires Energy Fuels' compliance with "applicable federal, state, and local laws," implicitly including environmental regulations and water permitting. We conclude that these conditions limit any potential harm to other water users or to the environment that could arise from the Board's decision to annualize the average daily rate of processing.

In conclusion, we discern no abuse of discretion by the Board in limiting the mill's operation to 500 tpd averaged annually as a condition to the SUP.

The judgment is affirmed.

Judge ROMÁN and Judge BOORAS concur.