**WELLS FARGO INSURANCE SERVICES USA, INC.,**
**Plaintiff,**

v.

**Glenn W. MCQUATE, Paul Prouty, and Mary Wong, Defendants.**

**Civil Action No. 1:14–cv–2565–RM–MJW**

United States District Court,
D. Colorado.

Signed August 1, 2016

Filed 08/02/2016

Christopher T. Patrick, Timothy Michael Kratz, Jackson Lewis, P.C., Denver, CO, Peter R. Bulmer, Jackson Lewis, P.C., Chicago, IL, for Plaintiff.

Amy L. Miletich, Brendan Daniel Benson, Miletich PC, Denver, CO, for Defendants.

## AMENDED ORDER [1]

RAYMOND P. MOORE, United States District Judge

This matter is before the Court Defendants' Motion for Summary Judgment

1. In accordance with the Court's advisement to the parties at the trial preparation conference on August 1, 2016, the prior Order of July 20, 2016 (ECF No. 103) is amended to clarify the trade secrets issue. That clarification is reflected by the addition of and as noted in footnotes 9 and 20 of this Order of August 1, 2016, and the addition of the word

("Motion") (ECF No. 57) on Plaintiff Wells Fargo Insurance Services USA, Inc.'s ("Wells Fargo") claims arising from allegations that Defendants engaged in wrongful conduct, designed to harm Wells Fargo, before and after their en masse departure of employment to open the office of a competitor, McGriff, Seibels & Williams ("McGriff"). Upon consideration of the Motion, Response, Reply, the applicable statutes and case law, and being otherwise fully advised, the Motion is **GRANTED in part and DENIED in part.**

## I. PROCEDURAL AND FACTUAL BACKGROUND [2]

### A. Plaintiff's Business and Defendants' Employment

Wells Fargo is in the business of procuring and servicing insurance coverages for various business lines, including the ones at issue here—energy and mining. Defendants were three of about 35 employees based in Wells Fargo's Denver, Colorado office. Defendants had a good working relationship with each other; they considered themselves a "team."

In this business, Wells Fargo does not underwrite the insurance policies but, rather, has relationships with insurance writers and brokers the insurance coverages on behalf of its business clients. Some clients require Wells Fargo to execute non-disclosure agreements prior to providing Wells Fargo information to obtain coverage while other clients do not. Even in the absence of a nondisclosure agreement with a client, Wells Fargo does not disclose that information to anyone outside their office other than when attempting to place coverage for clients. In those instances, Wells Fargo shares selected client information, such as renewal dates, premium information, and sometimes deductible information, with various insurance companies in order to place coverage for clients even though Wells Fargo does not have non-disclosure agreements with the carriers. Clients may—and do—share their policies with other brokerages if they are considering changing brokers, which may occur for any number of reasons.

Wells Fargo considers various information to be confidential and trade secrets, including the combination of information it receives from clients and how it uses that information to place coverage. As Jon Lindstrom, Managing Director of Wells Fargo's Denver office, explained: "A deductible is one piece of the entire insurance negotiation. ... [T]here's terms and conditions, there's layering of coverages. All of these come into play as part of the package of a trade secret." (ECF No. 64-5, pages 194.) Wells Fargo considers its CRIP reports to be "trade secrets"; these are monthly reports which list significant current policies that will renew within 120–150 days. These reports contain information on those accounts, including the client, line of business, underlying insurance carrier, types of policies, revenues associated with each insurance policy, and renewal date. These reports are generated from information contained in Wells Fargo's password protected system called "Nexsure." Wells Fargo uses these reports for renewals. And, although one or more of Defendants have testified to the contrary, the evidence shows they too have used their reports to perform their duties and responsibilities.

Wells Fargo also considers how it markets itself to be a trade secret. However, if a Wells Fargo marketing presentation was

"may" on page 23, line 19. There are no other changes to the Order of July 20, 2016.

2. This is a summary of the facts; however, additional facts relevant to the Court's decision are also included in various sections to which such facts relate.

left with a client, and the client chose to do so, it could be given to a Wells Fargo competitor or other entity.

In January 2014, Wells Fargo sold 42 of its offices to USI Insurance Services ("USI"), which sale was completed around May 2, 2014. Defendants all had concerns about the sale. For example, Ms. Wong and Mr. Prouty expressed concerns about Wells Fargo's ability to service the remaining clients. Mr. McQuate complained because about 75% of his book of business and the office he reported to and relied on for support were sold to USI. After the sale, Defendants reported to Jon Lindstrom, the Managing Director of Wells Fargo's Denver office. Mr. Lindstom was one of three levels of management above Defendants.

It was after the sale to USI that Defendants decided to look for other employment. A look at Defendants' employment history prior to their departure from Wells Fargo, construed in a light most favorable to Wells Fargo, shows the following,

***Defendant McQuate.*** Mr. McQuate began working in the insurance industry in 1977. In about 1995, Mr. McQuate entered into an Employment Agreement (the "Acordia Agreement") with Acordia of West Virginia. As relevant to the issues, that agreement contains the following provisions:

- "8. Confidentiality and Restrictive Covenants"

\* \* \*

"(a) During and following Employee's employment with Employer, Employee will not disclose to any person or entity not associated with Employer any business, financial or other confidential and/or proprietary information of Employer and/or its customers, clients or insureds.

\* \* \*,

"(c) Upon termination of Employee's employment with Employer, regard-less of the reason for termination or whether the termination was initiated by Employer or by Employee, within three (3) days Employee shall deliver to Employer all data, manuals, lists, notes, writings, client lists, photographs, microfilm, tape-recordings, computer software and/or hardware, and all other documents or tangible materials whatsoever, including all copies or duplicates thereof, concerning the business or financial activities of Employer and/or its customers, clients or insureds. All such documents and tangible materials, and copies or duplicates thereof, are the sole property of Employer. Upon delivery of all such documents and tangible materials, and any and all copies and duplicates thereof, Employee shall certify in writing to Employer that all such documents and tangible materials have been returned and delivered to Employer and have not been further copied or disclosed to any person or entity not directly associated with Employer."

"(d) For a period of two (2) years after Employee's employment relationship with Employer has terminated for any reason, regardless of whether the termination was initiated by Employer or by Employee, Employee shall not, on Employee's own behalf or on behalf of any other person, firm, corporation, association or other entity, either directly or indirectly, solicit, sell, service, create, manage or implement any kind of service or product offered by Employer to any person, company, firm or corporation: (1) who is a client, customer or insured of Employer at the time during Employee's employment with Employer is terminated; (2) who was a client, customer or insured of Employer at any time within the two (2)

year period immediately preceding Employee's termination; or (3) whom Employee called upon while in the employ of Employer as a prospective client, customer or insured during the two (2) year period immediately preceding the termination of Employee's employment."

"(e) For a period of two (2) years after Employee's employment relationship with Employer has terminated for any reason ... Employee shall not, on Employee's own behalf or on behalf of any other person, corporation or entity, either directly or indirectly, solicit, induce, recruit or cause another person in the employ of Employer to terminate his or her employment for the purpose of joining, associating or becoming an employee with any business which is in competition with any business or activity engaged in by Employer."

\* \* \*

"... Employee also hereby ... specifically waives any defense of lack of protect[a]ble business interest on the part of Employer."

\* \* \*

- "20. Severability. The invalidity or unenforceability of any of the provisions or clauses in this Agreement shall in no way affect the validity or enforceability of any other clause or provision hereof."
- "21. Applicable Law. This Agreement shall be interpreted and enforced in accordance with the laws of the State of West Virginia."

At Acordia, Mr. McQuate was a profit center manager where he was responsible for office results and managed a staff of about 35 people. He worked for Acordia in Virginia until Acordia sold its business to Wells Fargo in 2001. At that time, Mr. McQuate became an employee of Wells Fargo and the Acordia Agreement was assigned to Wells Fargo. After the sale, Mr. McQuate continued to work in Virginia as a profit center manager. In approximately 2005, however, he became a Sales Executive where his duties were to secure new business and to service existing clients; he no longer had management responsibility.

In approximately 2010, at the request of Wells Fargo, Mr. McQuate moved to Denver. Mr. McQuate became a Senior Sales Executive and was paid on commission until Wells Fargo's sale of offices to USI; thereafter, he had a forgivable draw. Although Mr. McQuate reported to Mr. Lindstrom, employees who worked on his accounts also reported to him as Mr. McQuate managed their time and work, e.g., directing what work they performed. Nonetheless, Mr. McQuate did not have authority to determine the compensation of an employee; to transfer an employee from one department to another; to suspend an employee; to promote an employee; to discipline an employee; or to reward an employee. His authority was limited to making recommendations, such as to suspend, to promote, and to reward.

During his employment at Wells Fargo, Mr. McQuate received information he considered confidential from Wells Fargo customers, such as payroll, revenue (for private companies), auto schedules, financials, policies, drivers' information, layering, insurance premiums, coverage limits, and the insurance companies with whom the coverages were placed. Mr. McQuate, however, did not consider the identity of any Wells Fargo prospect to be confidential as the names could be easily obtained from various public sources. Nonetheless, ADA Carbon Solutions was a prospect given to him by a business development officer at Wells Fargo Bank. And, Mr. McQuate admits that if McGriff received the confidential information Mr. McQuate had while at

Wells Fargo, it would give McGriff an advantage over Wells Fargo. Mr. McQuate denies knowledge of and familiarity with Wells Fargo's "CRIP" report, but email communications show to the contrary.

As part of his job at Wells Fargo, Mr. McQuate handled day-to-day needs of customers and negotiations and presentations for renewals. Mr. McQuate is able to recall information about accounts he handled, *e.g.*, Cloud Peak Energy, Sunshine Silver Mines, Vista Gold, ADA Carbon Solutions, and Molycorp.

***Defendant Prouty.*** Prior to working for Wells Fargo, Mr. Prouty worked for competitors. Mr. Prouty was hired by Wells Fargo in 2013 to be a part of the energy and mining team. There, he was a Sales Executive in the Denver office. His job was to generate new business opportunities, write new business, and then service the business. Mr. Prouty signed a "Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non–Solicitation, and Assignment of Inventions" ("WF Agreement") (ECF No. 57–22), which contains the following relevant provisions:

- "II. Trade Secrets And Confidential Information"

 * * *

 "I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this Information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home."

- "III. Non–Solicitation Of The Company's Customers And Employees"

 "I agree that for a period of two (2) years immediately following termination or resignation of my employment for any reason, I will not do any of the following either directly or indirectly or through associates, agents, or employees:

 a. solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services; or

 b. solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship."

- "VIII. Severability And Judicial Modification"

 "If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall remain in full force and effect and the invalid or unenforceable provision shall be modified only to the extent necessary to render that provision valid and enforceable to the fullest extent permitted by law. If the invalid or unenforceable provision cannot be modified,

that provision shall be severed from the Agreement and all other provisions shall remain valid and enforceable."

The WF Agreement defines "Confidential Information" as "the Company's Trade Secrets and other proprietary information relating to its business, business methods, personnel, and customers." "Trade Secrets" are defined as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Examples of such "trade secrets" are also listed. And, in addition, the WF Agreement provides that it "shall be governed by the law of state where the incident(s) giving rise to the dispute or claim arose."

As with Mr. McQuate, Mr. Prouty's responsibilities are sales and managing his book of business. Mr. Prouty was paid a forgivable draw. As to any employee, he did not have authority to determine compensation; transfer; suspend; promote; discipline; or reward. He did have authority to make recommendations on people who were working on his accounts, such as rewards. Mr. Prouty delegated work to eight or ten people and managed their time—what they did, how they worked, what accounts they worked on at their behest.

Mr. Prouty received CRIP reports showing upcoming renewals, which he would review and use to start the renewal process.

***Defendant Wong.*** Ms. Wong has worked in the energy and mining insurance industry since approximately 1989. Wells Fargo hired Ms. Wong in January 2012, as an Insurance Practice Leader—a national resource for the mining and energy group. Ms. Wong worked with financial officers and risk managers of mining company clients to assist them in procuring insurance coverage for their companies. There are apparently about seven different types of insurance practice leaders at Wells Fargo. Unlike Messrs. Prouty and McQuate, Ms. Wong did not have responsibility to generate new business. Her responsibilities were to build a practice and provide mining support throughout the company. Her employment agreement is the same as that of Mr. Prouty, *i.e.*, the WF Agreement. Unlike Messrs. Prouty and McQuate, as an Insurance Practice Leader, Ms. Wong was paid a salary plus bonus.

Ms. Wong could not hire, fire, transfer, determine compensation, discipline, promote, or reward but could make recommendations. She, like Messrs. Prouty and McQuate, assigned job responsibilities to others in the mining group. But, unlike Messrs. Prouty and McQuate, Ms. Wong interviewed prospective team members and whether they were qualified to join the group. And, the reasonable inference is that if Ms. Wong determined the interviewee was not qualified, he or she would not be hired for—or transferred to—the position.

***Other Employees' Testimony.*** Cheryl Vandermosten testified that she did work for Ms. Wong and Mr. McQuate, who provided feedback on her performance which would impact her annual reviews. Defendants assigned her job responsibilities; if she had a question, she would ask whoever assigned her the project. When Diana Banks, an account representative who worked with Defendants, was asked who her "manager was" she answered "Rita Nicholson is my HR. She's the one that gives me my reviews and raises." (ECF

No. 64–3, pages 105–06.) "She's over all the service staff." (*Id.*)

## B. Defendants' Resignation and Move to McGriff

The evidence is unclear and Defendants' testimony is inconsistent and even contradictory as to their interactions and how they all—"coincidentally"—resigned on August 22, 2014. For example, their testimony differs as to who told whom first that they were thinking of leaving; as to who knew whom was interested in working for McGriff and when; and as to how they all ended up meeting with McGriff. What is clear, however, is by July 2014, Defendants were discussing moving to McGriff. They all met with McGriff at a lunch meeting, where Mr. McQuate gave McGriff a copy of his Acordia Agreement. And, thereafter, on July 18, 2014, Defendants had a telephone conference with counsel for McGriff,[3] followed by offer letters from McGriff. Defendants would be opening McGriff's Denver office. What is also clear is that Ms. Wong took the lead in communications with McGriff and in negotiations of a total "package" compensation for the "group," *i.e.*, Defendants.

On August 22, 2014, Defendants tendered letters of resignation to Wells Fargo. Mr. McQuate's and Ms. Wong's resignations were nearly identical in all material respects, resigning effective that date, but offering a two-week notice, "if needed," as a "professional courtesy." Mr. Prouty's resignation, however, gave two weeks' notice, effective September 5, 2014. Wells Fargo accepted Mr. McQuate's and Ms. Wong's resignations as tendered—effective August 22, 2014. Mr. Prouty's employment was also terminated effective that date.

## C. Events Subsequent to Defendants' Departure from Wells Fargo

Upon Defendants' departure to work for McGriff, a number of events occurred which serve as a basis for Wells Fargo's claims.

### 1. Missing Files and Deleted Emails

After Defendants' departure, Wells Fargo looked through Defendants' files for information on accounts but was unable to locate files on certain accounts and found very little emails. Because Wells Fargo was unable to locate this information, and because Ms. Wong was frequently seen taking notes, Wells Fargo believes—or suspects—there are missing files and deleted emails. Mr. McQuate, however, did retain notes which contain a list of accounts which were sold to USI. Nonetheless, except with for these notes, Wells Fargo cannot say that any missing files or information were taken by Defendants. For example, as for emails, Mr. Lindstrom testified that Mr. McQuate's emails "appeared" to have been deleted. (ECF No. 57–6, page 58.) And, Wells Fargo's search of information related to pending deals "suggests" Defendants deleted their emails.

### 2. "Solicited" Clients

A number of clients moved their business—or considered moving their business—from Wells Fargo after Defendants' departure. At issue is whether these clients were improperly "solicited." Wells Fargo and Defendants differ on what constitutes "solicitation"—Defendants contend any solicitation requires that contact be initiated by them, while Wells Fargo considers solicitation within the employment agreements applies whether the former employee initiates the contact or the client initiates the contact. Cheryl Vandermosten, a former Wells Fargo employee who worked with Defendants, testified that Wells Fargo's definition is an industry standard among insurance brokers.[4] The clients at issue are as follows.

---

3. Actually, with McGriff's parent corporation.

4. Although not cited by the parties, the record shows she has 40 years of insurance experience. (ECF No. 64–9, page 114.)

*Cloud Peak Energy.* While at Wells Fargo, Mr. McQuate and Ms. Wong serviced Cloud Peak's account. Kristin Jacobs, the Director of Insurance for Cloud Peak, is a personal friend of Ms. Wong's; they travel together on business trips and socialize often. Ms. Jacobs and her husband are friends with Ms. Wong and her husband. The evidence of Cloud Peak's move to McGriff shows the following.

First, prior to Ms. Wong's resignation, on June 11, 2014, Ms. Wong sent Ms. Jacobs a mining application signed May 30, 2014, with Wells Fargo as the Broker of Record. Cloud Peak's casualty insurance renewal was on September 30, 2014. There is, however, a second mining application with a July 15, 2014 date, signed by Ms. Wong, showing McGriff as the broker of record. (ECF No. 64–10, pages 168–69.)

Next, after her resignation was accepted, Ms. Wong advised McGriff she could start Monday, August 25, 2014. That same afternoon, Ms. Jacobs told Ms. Wong that she wanted to contact McGriff. On Sunday evening, August 24, 2014, Ms. Wong advised McGriff that Ms. Jacobs would be contacting them. On Monday morning, August 25, 2014 at 6:30 a.m., Ms. Jacobs advised Ms. Wong she had contacted McGriff to change the Broker of Record (BOR) from Wells Fargo to McGriff. Ms. Wong made a couple of negative remarks concerning Wells Fargo, including a text the morning of August 25, where she commented about the knowledge or experience (or lack thereof) of a Wells Fargo claims person, stating "It's unbelievable. See what I'm talking about?" (ECF No. 64–10, page 141.)

Finally, after this lawsuit was filed, Ms. Jacobs provided a sworn statement that Wells Fargo contacted her on August 22, 2014 to notify her of Ms. Wong's departure; she did not know Ms. Wong was leaving. Ms. Jacobs stated that she moved her business to McGriff because Cloud Peak already had an existing relationship with McGriff; that she contacted Wells Fargo about a new claim on Sunday, August 24, 2014, which the contact at Wells Fargo did not appear to know how to handle so Ms. Jacobs contacted the London broker to directly report the claim; and that no senior member of Wells Fargo contacted her about their insurance brokerage relationship. In addition, Ms. Jacobs stated that Defendants did not solicit Cloud Peak's business or attempt to divert Cloud Peak's business away from Wells Fargo; that she provided Ms. Wong Cloud Peak's insurance related information so that McGriff could place the insurance coverage; and that she provided this information to other wholesale brokers and insurers. Cloud Peak, through Ms. Jacobs, moved its business to McGriff on Tuesday, August 26, 2014, two business days after Ms. Wong resigned.

*ADA Carbon.* On or after Friday, August 22, 2014,[5] Ms. Wong asked Peter Hansen,[6] General Counsel of ADA Carbon to "connect" with her via LinkedIn, hoping he would want to do business with her at McGriff. He accepted her invitation on Monday, August 25, 2014. Ms. Wong worked with Mr. Hansen while at Wells Fargo and knew that ADA Carbon was a Wells Fargo customer. Messrs. McQuate and Prouty had also done work for ADA while employed by Wells Fargo.

---

5. Ms. Wong testified she sent a request to connect to notify Mr. Hansen that she had changed jobs; therefore, it must have occurred on or after August 22, 2014.

6. The papers sometimes refer to him as "Hanson."

Mr. Hansen provided a Declaration that he learned Defendants had left Wells Fargo through a call from Wells Fargo and from one of ADA's insurance carriers. From that, Mr. Hansen contacted Ms. Wong to ask about Wells Fargo and McGriff. He did not contact her again until January 2015. At that time, ADA invited Defendants, and others, to participate in the process to choose an insurance broker. Mr. Hansen set up a meeting for Defendants to do so, where Defendants made it clear they wanted ADA's business. According to ADA's Chief Financial Officer, ADA awarded its insurance business to a third-party and the bond business to Defendants. As to the bond business, ADA did so because Defendants had done the necessary work when they were employed by Wells Fargo, and ADA wanted them to receive the fee for the work. The decision was not made by Mr. Hansen.

*Sunshine Silver Mines.* According to Mr. McQuate, Roger Johnson, the CFO, reached out to him and asked for a presentation from McGriff. Mr. McQuate and Ms. Wong were the leads on the presentation, proposal, and follow ups. Sunshine Silver became a client of McGriff's after Mr. McQuate joined, and McGriff now performs the services that Wells Fargo used to perform for McGriff. Roger Johnson, Chief Financial Officer of Sunshine Silver, provided a Declaration stating that he received a call from Wells Fargo that Defendants had left. After Defendants' departure, Wells Fargo performed some services with which Sunshine Silver was unsatisfied, Therefore, Mr. Johnson contacted Mr. McQuate and Marsh & McLennan Companies (another brokerage firm), sending both a request for proposal. Mr. Johnson affirmatively states Sunshine Silver was not solicited by Defendants.

*Coeur Mining.* In June or July of 2013, while employed by Wells Fargo, Mr. Prouty had contacted Coeur Mining and requested a meeting. All Defendants met with Coeur Mining but were unsuccessful in obtaining their business. Subsequently, in November or December 2014, while employed by McGriff, Mr. Prouty contacted Coeur Mining again but was unsuccessful in obtaining its business.

*Vista Gold.* Mr. Prouty had no involvement with Vista Gold at Wells Fargo or McGriff. According to Mr. McQuate, Jack Engele, Vista Gold's Chief Financial Officer, reached out to him while after he joined McGriff, and asked for more information on McGriff. In Mr. McQuate's first meeting with Vista Gold, they were discussing directors and officers' liability insurance, coverage which Wells Fargo did not place for Vista Gold. Thereafter, Mr. McQuate and Ms. Wong had Mr. Engele put together information for a property casualty quote. Mr. Engele confirmed that Defendants did not solicit Vista Gold's business—that its auditors recommended McGriff and Mr. McQuate as the contact.

*Molycorp.* While at Wells Fargo, all Defendants serviced Molycorp. One of Molycorp's bonds was sold to USI as part of Wells Fargo's sale of business to USI. When it came time for renewal of the bond, Mr. McQuate decided to refer the bond renewal to USI. Mr. McQuate testified he did so because it was in the best interest of Molycorp as he only had two weeks to take care of the renewal. Mr. Lindstrom testified that Wells Fargo could have secured and serviced the bond.

On September 3, 2014, Ms. Wong drafted an email to Greg Fischer of Molycorp, forwarding it to Messrs. Prouty and McQuate for review first. Ms. Wong stated that the email was in response to Mr. Fischer contacting her, wanting to know more about McGriff. In that draft email, Ms. Wong stated "I just don't want it to be too much selling/soliciting." (ECF No. 64–10, pages 156–57.) Subsequent to Ms.

Wong's email to Mr. Fischer, Defendants presented a proposal to Molycorp but ultimately did not get its business. Wells Fargo had Molycorp's property and casualty business, but Molycorp moved that business to Hayes, another brokerage.

*Target Drilling.* Target Drilling also moved its business from Wells Fargo to McGriff. Mr. McQuate was not involved with Target Drilling at Wells Fargo or the movement of its business from Wells Fargo to McGriff. Similarly, Mr. Prouty had no involvement with Target Drilling at Wells Fargo and has no involvement with Target Drilling at McGriff. Target Drilling is working with Ms. Wong at McGriff.

Ms. Wong testified that Don William of Target Drilling called her after he was notified that she had changed jobs. In that call, Mr. William told her he wanted to follow her to wherever she was; he had been her client prior to her joining Wells Fargo. Ms. Wong advised Mr. William to put into his letter that "We have not solicited your business." (ECF No. 64–10, page 162.) Mr. William's provided a Declaration confirming Ms. Wong's testimony—Target Drilling worked with Wells Fargo because Ms. Wong went to work there, and then followed her to McGriff. In addition, Target Drilling provided Ms. Wong with the information needed to assist with its insurance needs.

### D. Wells Fargo's Claims

In response to Defendants' resignations and the subsequent departure of its clients, Wells Fargo filed this action, raising the following claims: (1) Breach of Contract; (2) Breach of Duty of Loyalty; (3) Misappropriation of Trade Secrets—Uniform Trade Secrets Act; (4) Unfair Competition; (5) Conversion; (6) Tortious Interference with Prospective Business Advantage; (7) Intentional Interference with Contractual Relationships; and (8)

Civil Conspiracy. Defendants seek summary judgment on all claims.

### II. STANDARD OF REVIEW

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Henderson v. Inter–Chem. Coal Co., Inc.,* 41 F.3d 567, 569–70 (10th Cir. 1994). "A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion . . . ." *Robertson v. Bd. of Cty. Comm'rs of the Cty. of Morgan,* 78 F.Supp.2d 1142, 1146 (D. Colo. 1999) (citation omitted). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial. *See 1–800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the

non-moving party. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e). "[C]onclusory, self-serving, and generalized denials" are insufficient to defeat summary judgment. *Sartori v. Susan C. Little & Associates, P.A.*, 571 Fed.Appx. 677, 680 (10th Cir. 2014).

## III. LEGAL ANALYSIS

### A. The Agreements are Valid

#### 1. Applicable Law—Colorado and West Virginia?

The parties do not dispute that Wells Fargo's breach of contract claims against Ms. Wong and Mr. Prouty are governed by Colorado law, as provided under their WF Agreements. The parties do dispute whether Wells Fargo's breach of contact claims against Mr. McQuate are governed by Colorado law as his employment agreement provides that it should be interpreted and enforced under West Virginia law. Relying on various facts over the term of Mr. McQuate's agreement, Defendants argue Colorado law applies. Defendants impliedly acknowledge that, if West Virginia law applies, the non-compete in Mr. McQuate's Acordia Agreement is valid.

■ Wells Fargo also relies on the history of Mr. McQuate's employment, but argues such history shows West Virginia law applies, or the Court need not determine which law applies. Upon an analysis

of the matter, the Court finds Colorado law applies.

■ Under § 187 of the Restatement (Second) of Conflicts of Law (hereafter "Restatement"), adopted in Colorado, the law of the state chosen by the parties will be applied unless either "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *See Jacquat v. Hub Int'l Ins. Servs., Inc.*, No. 09-cv-02539-WYD-MJW, 2010 WL 9568710, at *3 (D. Colo. June 15, 2010). As to the second exception, in order for Colorado law to apply, the Court must find (1) Colorado law would apply if there were no choice of law provision in Acordia Agreement; (2) application of West Virginia law could be contrary to a fundamental policy of Colorado; and (3) Colorado has a materially greater interest than West Virginia in determining the enforceability of the non-compete provision at issue. *Id.* at *3.

■ In contract actions, Colorado applies the "most significant relationship" test under the Restatement § 188 to determine which state's law should apply. *See Wood Bros. Homes, Inc. v. Walker Adj. Bureau*, 198 Colo. 444, 601 P.2d 1369, 1372–73 (Colo. 1979). Thus, the court considers (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of the business of the parties. The contacts are to be

evaluated in accordance to their relative importance in light of the particular issue. Restatement § 188(2).

In this case, the place of contracting and negotiation were not in Colorado, but that is relatively unimportant in light of the assignment of the Acordia Agreement to Wells Fargo. And, according to the Verified Complaint, Wells Fargo is a North Carolina corporation with its principal place of business in North Carolina. Nonetheless, Wells Fargo has an office in Colorado—and it is in Colorado where Mr. McQuate resides, and it is in the Denver office where Mr. McQuate performed services for Wells Fargo (even though his work required him to travel outside of Colorado). Moreover, the subject matter of the contract and the non-compete provision at issue are "located"—to be enforced—in Colorado. Accordingly, Colorado law would apply in the absence of a choice of law provision.

Next, in light of the differences between West Virginia law and Colorado law as to the enforceability of restrictive covenants,[7] application of West Virginia law would be contrary to the fundamental policy of Colorado against covenants not to compete. *See Jacquat*, 2010 WL 9568710, at *4. Finally, in light of the above factors, the Court finds Colorado has a materially greater interest than West Virginia in the determination of the enforceability of the non-compete provision. Accordingly, Colorado law applies.

### 2. The Non–Compete Provisions

Colorado law provides that covenants not to compete are void, unless they fit within one of the four statutory exceptions. Colo. Rev. Stat. § 8–2–113(2). At issue here is whether either or both of these two exceptions apply: (1) the agreements were for the protection of trade secrets (second exception); and (2) Defendants were "ex-

ecutive and management personnel" (the fourth exception).

#### a. The Executive and Management Personnel Exception

■ *The Time of Contracting Does Not Control.* The parties dispute at what point in time should an employee's status be examined to determine whether he or she was executive and management personnel—at the time the employee enters into the contract or at the time when the contact is terminated? Wells Fargo contends it is the former, while Defendants argue it is the latter. The Court agrees with Defendants.

In *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835 (Colo. App. 2007), one of the issues was when the applicability of the "professional staff" exception to the prohibition against non-competes should be determined—at the time the employee signed the contract or the time he left his employment. The employer argued the exception should be determined based on the employee's status at the time the employee left, when the employee was a manager. The Colorado Court of Appeals found otherwise, as "[a] covenant or provision that is void ab initio is null from the beginning, as from the first moment when a contract is entered into." *Id.* at 841. Accordingly, that court found "the validity of a noncompetition provision is determined as of the time the agreement is entered into, and not as of any time thereafter." *Id.* Nonetheless, Defendants argue the case is distinguishable because the employee there fit within the executive and management personnel exception when he left his employer but not when he signed the agreement; therefore, the agreement was void from the beginning. The Court agrees. Accordingly, whether the exception applies is to be de-

---

7. Wells Fargo does not argue otherwise.

termined as of the time of the employee's departure.

**The Evidence Sufficiently Shows the Exception May Apply—to Ms. Wong.** Ordinarily, the determination of whether an employee is executive or management personnel is a question of fact. *Phoenix Capital*, 176 P.3d at 841. The Court has discerned no clear rule or test used by the Colorado courts to make such a determination, but it has been stated that "[c]ourts focus[ ] more on an employee's degree of skill, knowledge, or autonomy, rather than his or her relationships with customers." *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 738 (Colo. Ct. App. 2006). It has also been stated that "[m]anagement" is an "ordinary word[ ] of common usage" with an unambiguous meaning. *Dish Network Corp. v. Altomari*, 224 P.3d 362, 366 (Colo. Ct. App. 2009). Further, a review of the cases shows some factors to consider in evaluating whether the exception applies:

(1) whether the employee was in charge or supervised a business, *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 795 (Colo. Ct. App. 2001) (employee who did not supervise or manage anyone and had three levels of management employees above him was not within the exception), *abrogated in part on other grounds by Ingold v. AIMCO/Bluffs, L.L.C. Apts.*, 159 P.3d 116 (Colo. 2007); *Dish Network*, 224 P.3d at 366, 368 (manager who directed, controlled, and supervised approximately 50 people nationwide in a division of a business with a $10 Million budget within exception); *Management Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo. Ct. App. 1988) (exception did not apply to "account executives" who were primarily information gatherers); (2) whether the employee acted in an unsupervised capacity, *Reed Mill*, 165 P.3d at 738; *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1342 (Colo. App. 1984) (exception did not apply where

employee (a salesperson) was not in charge of the business' existing contracts and did not act in an unsupervised capacity); *see Dish Network*, 224 P.3d at 367;

(3) whether the employee was paid based on production, *Alexander & Alexander, Inc. v. Frank B. Hall & Co.*, No. 88-A-1621, 1990 WL 8028, at *21 (D. Colo. Jan. 31, 1990); and

(4) whether the employee had hiring or firing authority, *Continental Credit Corp. v. Dragovich*, No. 13-cv-01349-WYD-MJW, 2013 WL 3303976, at * 4 (D. Colo. July 1, 2013) (exception did not apply to "Regional Account Manager" where his duties were that of a salesperson; employee supervised two people but had no hiring or firing authority).

The resolution of the issue requires an examination of "what the job actually entails," and not just "mere job titles." *Doubleclick Inc. v. Paikin*, 402 F.Supp.2d 1251, 1258 (D. Colo. 2005). With this background, the Court evaluates each Defendant's duties and responsibilities.

■ **Messrs. McQuate and Prouty.** As stated, the Court considers the exception as of the time of these Defendants' departure. At that time, Mr. McQuate was a Senior Sales Executive, was paid based on commissions until the sale in May 2014, when—after a loss of significant book of business through the sale—he was paid a forgivable draw. Mr. Prouty was a Sales Executive and also paid a forgivable draw. They were essentially salespersons, and had three levels of management above them. Both of these Defendants had no hiring, firing, or other similar authority; they could make recommendations but never did so. The fact that Messrs. Prouty and Mr. McQuate had authority to delegate work (which they apparently oversaw) on their accounts to employees and had input on such employees' performance re-

view, without more, does not convert their position to that of management. On this record, a reasonable trier of fact could not conclude that Mr. Prouty or Mr. McQuate was executive and management personnel, and, accordingly, this exception does not apply to them.

■ **Ms. Wong.** Whether Ms. Wong was executive and management personnel · is another matter. Unlike Messrs. McQuate and Prouty, Ms. Wong was not a sales executive but an Insurance Practice ·Leader for energy accounts nationally. She was not paid on commissions or a forgivable draw; she was paid a salary plus bonus. Her primary duties were related to developing new business and managing existing business. Unlike Messrs. McQuate and Prouty, she was not responsible for generating new business. Ms. Wong also had no authority to hire, fire, compensate, discipline, or the like but could make recommendations. But, unlike Messrs. Prouty and McQuate, Ms. Wong was actually involved in hiring decisions for the energy and mining practice group in Denver, interviewing existing Wells Fargo employees for potential transfers into the group. Mr. Prouty also considered Ms. Wong as· his supervisor, identifying her as such on his employment application with McGriff. And, while Ms. Wong may have had three levels of management above her, Wells Fargo appears to be a large national, even international, company, and she was apparently only one of few national practice leaders for the company. *See Doubleclick Inc. v. Paikin,* 402 F.Supp.2d, at 1259. Construed in a light most favorable to Wells Fargo, this evidence—along with reasonable inferences to be drawn therefrom—is sufficient from which a reasonable finder of fact could conclude that Ms. Wong was .executive and management personnel. *See Alexander & Alexander,* 1990 WL 8028, at *5 (allegations that employee supervised employees, independently handled needs of clients and developed new business in employer's national efforts to advised clients sufficient to plead employee was within exception).[8]

### b. The Trade ·Secrets Exception

■ **Estoppel.** Wells Fargo argues that Defendants expressly acknowledged the existence of and access to trade secrets in their respective employment agreements; therefore, Defendants are now estopped from denying the existence of trade secrets. The Court finds otherwise. The cases Wells Fargo relies upon do not hold that a party's general acknowledgement that confidential or proprietary information may exist, and/or that he or she would not disclose such information, standing alone, supports a finding that trade secrets exist or that the acknowledging party is estopped to argue otherwise. Nonetheless, as discussed below, the Court finds Wells Fargo has sufficiently demonstrated it has trade secrets.

■ **Trade secrets may exist.** A "trade secret" is "any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7–74–102(4). Factors to consider in determining whether a trade secret exists include: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the busi-

8. The Court, however, questions the validity of any reliance on the *Alexander* court's determination, on summary judgment, that certain defendants ·were not "executive or manage- ment personnel" where that court used a "beyond a reasonable doubt" standard which has not been shown to be applicable in this case. 1990 WL 8028, at *22. ·

ness, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (quoting *Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. Ct. App. 1990)). Trade secrets can consist of a combination of elements which are in the public domain or some of which are well-known, but their "unified process, design and operation . . . in unique combination, affords a competitive advantage" to the owner. *Rivendell Forest Prods., Ltd. v. Georgia–Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994) (quotation marks and citation omitted); *Harvey Barnett, Inc.*, 338 F.3d at 1129. What constitutes a trade secret is a question of fact. *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911 (Colo. App. 1997). And, "[a] determination as to the existence of a trade secret as a fact issue requires doubts as to existence of triable issues of fact which must be resolved in favor of the existence of triable issues." *Rivendell,* 28 F.3d at 1045.

■ At issue are three "groups" of information, which the Court will discuss in turn. First, whether clients' information shared with Wells Fargo, but which information clients may also share with whom they please, may nonetheless be trade secrets of Wells Fargo. Relying on *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) and *Sw. Stainless LP v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009), Defendants argue such information may not be trade secrets. The Court finds otherwise. *Ruckelshaus* and *Sw. Stainless LP* involved the owners' (in this case, Wells Fargo's clients)

sharing of their trade secrets with others. Thus, as to Wells Fargo's clients, their sharing of information may preclude such information from being trade secrets as to *them.* But that is not the issue here.

■ Next, the issue is whether Wells Fargo's prospects and marketing materials are trade secrets or whether because such information is widely known (prospects) and freely disseminated without restrictions (the marketing materials) to clients, it does not qualify as trade secrets. Wells Fargo did not specifically address "prospects" but the Court is not persuaded by Defendants' position. While the identity of mining companies in general—and thus which companies may be a prospect for insurance—is public information, Wells Fargo is seeking to preclude dissemination of *its* mining prospects, which information is not public. *See Doubleclick, Inc.*, 402 F.Supp.2d at 1258 (identity of targeted clients a potential trade secret). As for Wells Fargo's marketing materials, the Court agrees that in light of Wells Fargo's dissemination of its materials to clients which can be disclosed to anyone, including its competitors, such materials are not trade secrets.

■ Finally, whether Wells Fargo's CRIP reports are trade secrets, where such information was gleaned from its customers. Based on the current record, the Court finds Wells Fargo has sufficiently shown such reports are trade secrets. The fact that each of Wells Fargo's customers has *its* own information (and may disclose it to whom they please); or that some of this information may be public, does not preclude a finding that such information— in combination—is a trade secret as to Wells Fargo. *See Rivendell,* 28 F.3d at 1045; *Harvey Barnett,* 338 F.3d at 1129.

A consideration of the six factors also supports this finding. Here, there is no evidence that Wells Fargo's CRIP reports—or the combination of information

contained therein—are known outside the business. Wells Fargo has also sufficiently shown that only a limited number of employees within the business have access to such information and that it requires employees to maintain such information confidential. Although the savings effected is unclear from the record, even Mr. McQuate acknowledges that Wells Fargo's client information gives it a competitive advantage. While the money expended is also unclear, Wells Fargo has sufficiently shown it makes a relatively substantial effort in obtaining, developing and maintaining that information for future use. Finally, clearly it would take a competitor substantial time and effort to acquire and duplicate Wells Fargo's information—essentially, it would mean, at a minimum, its competitors would have to acquire this information individually from each of Wells Fargo's customers. Accordingly, the Court finds summary judgment may not be granted to Defendants on this issue.[9]

### 3. The Nonsoliciation Provision—The Solicitation of Customers [10]

"[T]here is no legal basis to enforce an agreement not to solicit customers, where § 8–2–113(2) would invalidate an agreement not to compete." *Phoenix Capital*, 176 P.3d at 844. "This follows because an agreement not to solicit customers is a form or an agreement not to compete." *Id.* The Colorado Court of Appeals has rejected the distinction between "active and passive solicitation efforts," stating that "[i]n order to make a living, the former employee needs to be free to solicit (actively or passively) former customers, as long as he or she does not use the employer's trade secrets to do so." *Phoenix Capital*, 176 P.3d at 844; *see also Saturn Systems v. Militare*, 252 P.3d 516, 526 (Colo. App. 2011) (quoting *Phoenix Capital*). In this case, Wells Fargo has sufficiently shown it has trade secrets subject to protection. But, in order for § 8–2–113(2) to apply to the non-solicitation provision, its purpose "must be for the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets." *Gold Messenger*, 937 P.2d at 910. What is reasonable depends on the facts of each case. *Reed Mill & Lumber*, 165 P.3d at 736.

Defendants contend the agreements are invalid as they were designed to prevent Defendants from competing with Wells Fargo, not to protect any alleged trade secrets.[11] Specifically, as to Ms. Wong and Mr. Prouty's agreements, Defendants argue (1) the section titled "Trade Secrets and Confidential Information" sufficiently affords Wells Fargo protection of any alleged trade secrets; and (2) the section titled "Non-solicitation of the Company's Customers and Employees" is neither necessary nor for the protection of trade secrets as that section does not mention "trade secrets."[12] As to Mr. McQuate, De-

9. By its statements in this Order, the Court is not finding, as a matter of law, that certain trade secrets exist. Instead, the Court finds there is sufficient evidence for submission of this issue to a jury.

10. To the extent Defendants rely on the non-solicitation of employees provisions in the employment agreements to support the contention that the nonsolicitation of customers provisions are not narrowly tailored or unreasonable in scope, that argument is rejected.

11. Defendants' arguments concerning solicitation are addressed in Section B, *infra*.

12. In Defendants' reply, they contend Wells Fargo has not claimed that the identity of its clients, customers, and prospective customers are trade secrets (ECF No. 81, page 9), contrary to its Motion which acknowledges that Wells Fargo identified prospects—prospective customers—as trade secrets (ECF No. 57, page 13). In addition, Wells Fargo identified its "nonpublic contact information (including the identity and contact information of key decision makers)" as trade secrets. (WF SOF # 1.)

fendants argue his agreement is not for the protection of trade secrets as it mentions only trade secrets once; contains provisions concerning other matters such as duties, compensation, and benefits; and precludes him from having any contact with Wells Fargo clients, regardless of whether he ever had any contact with such clients.

Wells Fargo views the agreements differently, arguing Ms. Wong's and Mr. Prouty's agreements' non-solicitation provision uses the term "Confidential Information" which is defined in the agreement to include "trade secrets"; Mr. McQuate's agreement's non-solicitation clause, when read in light of the surrounding language, shows it is reasonably limited to protect trade secrets; and, if this Court concludes the provisions are overbroad, the Court should reform the clauses and interpret it narrowly as the Colorado courts have done and as provided in the agreements. The Court's review of the matter finds merit to some arguments on both sides.

Starting with Ms. Wong and Mr. Prouty's agreements, the Court agrees with Defendants that the non-solicitation provision is overbroad and not sufficiently narrowly tailored for the protection of trade secrets, but agrees with Wells Fargo that the provision can be saved pursuant to agreements' "severability and judicial modification provision." Accordingly, these Defendants' non-solicitation is modified to preclude solicitation as provided for under the agreements, if he or she uses Wells Fargo's trade secrets to do so. *Phoenix Capital,* 176 P.3d at 844.[13]

■ Similarly, as to Mr. McQuate's agreement, the non-solicitation provision is overboard,[14] but the Court agrees with Wells Fargo that the agreement may be judicially modified, even though it does not provide for such modification. *See Whittenberg v. Williams,* 110 Colo. 418, 421, 135 P.2d 228, 229 (1943) (trial court acted within its discretion in reducing overbroad territorial restriction and enforcing it only to the extent necessary to afford employer contemplated protection); *Doubleclick, Inc.,* 402 F.Supp.2d at 1259 (recognizing court has authority to modify agreement to cure any unreasonable provision as to duration or scope). Accordingly, as to Mr. McQuate's agreement, on this record, the Court finds modification of that agreement to preclude solicitation, using Wells Fargo's trade secrets, of (1) Wells Fargo clients existing at the time of Mr. McQuate's termination whose accounts Mr. McQuate managed or worked on, or with whom he had actual contact during his employment; (2) Wells Fargo's former clients who were clients at any time within the two years preceding Mr. McQuate's termination, whose accounts Mr. McQuate managed or worked on, or with whom he had actual contact; and (3) prospective customers whom Mr. McQuate called upon while employed by Wells Fargo, during the two-year period [15] immediately preceding the termination of his employment with Wells Fargo. *See Management Recruiters of Boulder, Inc.,* 762 P.2d at 764–65 (affirming trial court's narrow construction of agreement prohibiting the contact of "any candidate . . . with whom the Ac-

13. The parties do not address the ramifications if the "executive and management personnel" exception also applies to Ms. Wong, to which the trade secrets exception requirements are inapplicable.

14. Defendants also argue that the purpose of Mr. McQuate's agreement is not for the protection of trade secrets because it also con-

tains other provisions, such as compensation and duties. The Court finds, however, when Section 8 of Mr. McQuate's agreement is read as a whole, Section 8(d) is for the protection of trade secrets.

15. Defendants do not challenge the temporal or geographic scope of the non-solicitation clauses.

count Executive had contact with or access to" to any candidate with whom the account executive "had *actual* contact"; emphasis in original).

## B. Breach of Contract—Count One

The Court finds the agreements, as modified, are valid. The next question is whether they were breached. Defendants argue they is no evidence of any breach; Wells Fargo contends it has presented sufficient evidence for the issue to go to a jury. The Court agrees, in part.

### 1. Use/Disclosure of Confidential Information and Trade Secrets

Defendants contend they did not use or disclose Wells Fargo's information as any information they used were provided by the clients voluntarily, and rely on their arguments concerning misappropriation of trade secrets. Wells Fargo addresses the trade secret issue as part of its misappropriation of trade secret claim. Accordingly, the Court considers this issue on the same basis as the misappropriation of trade secret claim, and, as discussed below, Wells Fargo has sufficiently demonstrated this claim may go forward.

### 2. The Taking of Wells Fargo's Information

▉▉▉ Defendants argue they have affirmatively stated they did not take any of Wells Fargo's property, while Wells Fargo has only a "mere suspicion" but no evidence that Defendants took anything. The Court agrees, in part, as Mr. McQuate admits he retained a document containing a list of accounts sold to USI. But, nonetheless, as Defendants argue, Wells Fargo has shown no damages from such retention. And, as for any other documents Wells Fargo claims (*e.g.,* possible missing emails and files), there is insufficient evidence that Defendants took any other documents belonging to Wells Fargo; Wells Fargo's "beliefs" and uncertainties as to what may or may not have existed are insufficient. Accordingly, summary judgment is appropriate in favor of Defendants as to this issue.

### 3. Soliciting [16] Wells Fargo's Clients

*Solicit/Solicitation.* The issues are, first, what constitutes "solicitation" and, next, whether Defendants "solicited" Wells Fargo's clients. Relying on *Atmel,* 30 P.3d at 793, Defendants argue the term "solicit" means "to approach with a request or plea" and requires Defendants to initiate contact. Wells Fargo, however, asserts that under common usage and the law, "solicitation" does not require "first contact" by Defendants. Moreover, Wells Fargo contends, under industry custom, whether a communication is a "solicitation" turns on whether the broker asks for business, not who contacted whom.[17]

In *Atmel, supra,* in evaluating the scope of a non-solicitation of *employees* provision, the Colorado Court of Appeals reversed the trial court's preliminary injunction to the extent it prohibited the individual defendants from participating in their new employer's hiring process involving their former co-workers who initi-

---

16. Defendants also assert Wells Fargo's definition of "solicit" renders the agreements overbroad (and therefore invalid) as it would preclude Defendants from even having a personal conversation with former clients. The Court does not read Wells Fargo's arguments as suggesting such as overbroad interpretation.

17. Defendants dispute this evidence, arguing the employee who gave the testimony is not qualified to testify about Colorado industry standards as she never signed a Colorado employment agreement. Defendants have not shown, however, that there is Colorado specific industry standard (as opposed to, for example, a national standard) or that any "Colorado standard" is different.

ated contact. The non-solicitation clauses stated the individual employees would not "either directly or indirectly ... solicit, recruit or attempt to persuade any person to terminate such person's employment with the [employer] Company...." *Atmel,* 30 P.3d at 793. The appellate court found the trial court's interpretation erroneous because of "the well-established principles of contract interpretation, considered in light of industry custom and practices[;] the language used by the drafter[;] and the necessity for a sensible result [which] require[d] that the non-solicitation clause be interpreted narrowly." *Id.* at 794.

As to contract interpretation, the court stated that a contract was to be interpreted in accordance with the plain meaning of its terms, and in light of the contracting parties' intentions. *Id.* at 792. Moreover, even "if a contract term is not ambiguous, evidence of industry standards may be used to demonstrate the parties' intent." *Id.* at 792–3. Thus, first, the court relied on the custom of the industry to interpret non-solicitation covenants to prohibit only solicitation, but not to preclude a former employee from having any involvement at all with the new employer's hiring process. Then, next, the court relied on the three words used in the covenant—solicit, recruit, or attempt—and found these definitions "all imply actively initiated contact." *Id.* at 793. In doing so, relying on *Webster's Third New International Dictionary,* the court stated " 'solicit' means to approach with a request or plea." *Id.* at 793.

 Contrary to Defendants' contention, the Court finds *Atmel* does not require that the term "solicit" or "solicitation" in the agreements at issue to apply only if Defendants "actively initiated contact" with Wells Fargo's clients or prospects. First, *Atmel* directs consideration of industry standards and Wells Fargo has presented sufficient evidence that such

standard does not require the restrained party to have initiated the contact. Second, *Atmel* does not preclude or limit other possible definitions of "solicit." In fact, *Atmel* relied on other language in the agreement and the term as defined in *Webster's.* And, *Webster's* online dictionary defines "solicit" to mean not only "to approach with a request or plea," as the *Atmel* court cited, but also "to make petition to: entreat," and "to urge (as one's cause) strongly." *See* http://www.merriam-webster.com/dictionary/solicit (visited July 20, 2016). Similarly, Black's Law Dictionary defines "solicitation" to include "[t]he act or an instance of requesting or seeking to obtain something; a request or petition," as well as "[a]n attempt or effort to gain business." Black's Law Dictionary 1607, 1608 (10th ed. 2014). Accordingly, on this record, the Court finds that, under Colorado law, conduct may fall within the definition of "solicit" and "solicitation" even in the absence of Defendants making the initial contact with Wells Fargo's client or customer.

The Court's review of cases from other jurisdictions, including those cited by Defendants and Wells Fargo, shows variations on how to interpret and apply a non-solicitation clause. Those cases varied as to the standard to be applied (in light of, for example, the state's policies or the clause in question), and whether initiation of contact by the restrained party was required. Despite such variations, they also show the application of the word "solicit" or "solicitation" requires a fact-specific inquiry into the wrongful conduct claimed. *See, e.g., General Assur. of Amer., Inc. v. Overby–Seawell Co.,* 893 F.Supp.2d 761, 771, 774–775 (E.D. Va. 2012) (applying strict scrutiny under Georgia law, finding there was "substantial authority" that the distinction between " 'solicitation' of business and 'acceptance' of business turns on which party initiated contact"; there, the customers

initiated the contact and requested the pitch from the restrained party); *Standard Register Co. v. Keala*, No. 14-00291 JMS-RLP, 2014 WL 3420785, at *6 (D. Haw. July 11, 2014) (in ruling on motion for temporary restraining order, declining to accept "at this time and on the record presented," plaintiffs' argument that agreements prohibit individual defendants from conducting business with plaintiffs' customers, regardless of who initiates the contact[18]; applying Hawaiian law); *Corporate Tech., Inc. v. Harnett*, 731 F.3d 6, 11–12 (1st Cir. 2013) (finding, under Massachusetts law which allows and enforces non-solicitation agreements, that there is no "per se rule vis-à-vis initial contact," and, "first contact," standing alone, "will rarely tell the whole tale"); *Bessemer Trust Co., N.A. v. Branin*, 16 N.Y.3d 549, 557, 925 N.Y.S.2d 371, 949 N.E.2d 462, 469 (2011) (finding, under New York law which has an implied covenant against soliciting former customers upon the sale of a business, that "[t]here is no hard and fast rule in determining whether the seller of 'good will' has improperly solicited his former clients"); *USI Ins. Servs. LLC v. Miner*, 801 F.Supp.2d 175, 190–193 (S.D.N.Y. 2011) (applying *Bessemer* to nonsolicitation covenant in employment agreement). Accordingly, this Court "decline[s] the defendants' invitation to assign talismanic importance to initial contact." *Corporate Tech., Inc.*, 731 F.3d at 12. "Solicitation can take many forms, and common usage suggests that the word has a protean quality." *Id.* at 12. Thus, the identity of the party making initial contact is just one factor among many that should be considered in determining whether Defendants engaged in prohibited "solicitation."[19] Accordingly, the Court will examine the disputed customers/prospects in light of this determination.

***Wells Fargo's Clients or Prospects.*** Defendants argue because Wells Fargo has no evidence that Defendants "requested" or "approached" any specific client to switch to McGriff, they did not violate the agreements. Further, they contend, the evidence shows former clients contacted Defendants and wanted more information about or were interested in doing business with McGriff. And, as to Coeur Mining, it is not within the contemplation of the employment agreements as it was not a former Wells Fargo client and had not been contacted in more than a year before Defendants' departure. Moreover, Wells Fargo has suffered no damages as Coeur Mining is not a McGriff customer. The same holds true for Molycorp as it is also not a McGriff customer.

Wells Fargo, however, contends there is no dispute that Defendants "requested" Wells Fargo clients Molycorp, ADA Carbon, Sunshine Silver Mines, Vista Gold, and Coeur Mining to move their business to McGriff. And, further, the record of communications between Defendants and Cloud Peak and Target Drilling are sufficient for a jury to determine whether such communications were "requests" for business. Moreover, Wells Fargo argues that even if Defendants' interpretation is adopted, the evidence is sufficient for a

---

18. In so ruling, the court cited to decisions from a number of jurisdictions, none of which appear to reach a distinction based solely on who initiated contact with whom. In fact, one citation provides "Under the definition of Black's Law Dictionary, solicitation is not confined only to the verbal act of asking or requesting something, or to the act of formally first approaching an employee...." *Standard Register*, 2014 WL 3420785, at *6 n.8 (quoting *Meyer–Chatfield v. Century Bus. Serv., Inc.*, 732 F.Supp.2d 514, 522 (E.D. Pa. 2010)).

19. For the same reasons, the Court rejects Defendants' contention that the agreements are invalid because Wells Fargo's definition of the term "solicit" includes contacts where the client reaches out to Defendants first.

jury to weigh and conclude that. Defendants solicited Wells Fargo's clients.

 Based on the record, the Court concludes there is a genuine issue of material fact as to whether each of the Defendants "solicited" one or more of Wells Fargo's clients in violation of their agreements. The Court addresses each customer/prospective customer in turn.

Starting with Cloud Peak Energy, Ms. Jacobs provided an affidavit that she did not know that Ms. Wong was leaving Wells Fargo, and she moved her business to McGriff the Monday after Ms. Wong's Friday's resignation based not on any solicitation by Defendants but by events which occurred after Ms. Wong's resignation. There is, however, evidence of a mining application sent by Ms. Wong to Ms. Jacobs dated July 15, 2014, showing McGriff as the broker of record while Ms. Wong was still employed by Wells Fargo. There is also evidence that Ms. Jacobs already sought to contact McGriff the afternoon of Ms. Wong's resignation. Further, Ms. Wong and Ms. Jacobs are personal friends who—along with their husbands—socialize together. Construing the facts in a light most favorable to Wells Fargo, a reasonable factfinder may conclude, for example, that Ms. Jacobs knew that Ms. Wong was leaving and Ms. Wong solicited Cloud Peak Energy's business.

Second, as to ADA Carbon, on Monday, August 25, 2014, Mr. Hansen, General Counsel of ADA Carbon accepted Ms. Wong's request to "connect" with her via LinkedIn. Ms. Wong—who did work with Mr. Hansen while at Wells Fargo—did so in hopes that he would want to do business with her at McGriff. And, it was Mr. Hansen who subsequently set up a meeting for Defendants to pitch their proposal for ADA Carbon's business. Thus, a reasonable factfinder may conclude that Ms. Wong solicited Mr. Hansen's business.

Third, as for Sunshine Silver Mines and Vista Gold, the undisputed evidence shows no solicitation by any Defendant. Instead, Sunshine Silver asked for a proposal when it became unsatisfied with Wells Fargo's services after Defendants' departure, and Visa Gold's auditors recommended McGriff and Mr. McQuate.

Fourth, Molycorp was Wells Fargo's client for bond and property and casualty business. There is a material factual dispute as to whether Mr. McQuate turned away the bond renewal business in the best interest of the client as he was unable to handle the same, or whether, as Mr. Lindstrom testified, Wells Fargo could have secured and service that business. Moreover, a little more than a week after Defendants collectively resigned, Ms. Wong sent an email to the other Defendants concerned about whether her email to Molycorp was "too much selling/soliciting." On this record, construing the evidence and the inferences therefrom in a light most favorable to Wells Fargo, reasonable jurors could conclude Defendants improperly solicited Molycorp's business. Nonetheless, Defendants argue Wells Fargo was not damaged because Molycorp is not a McGriff client; Molycorp moved its business to another competitor. That begs the question, however, of whether Wells Fargo lost Molycorp's business because of Defendants' solicitation.

Fifth, as to Coeur Mining, while Mr. Prouty's actions constituted solicitation, no damage has been shown. Coeur Mining was not a Wells Fargo client and is not a McGriff client.

Finally, as to Target Drilling, the evidence shows Target Drilling followed Ms. Wong to Wells Fargo and then to McGriff. In light of this evidence, Ms. Wong's request to Mr. Williams of Target Drilling to put into his letter that Defendants have not solicited his business does not support

a factual dispute sufficient to submit to a jury.

## C. Breach of Duty of Loyalty—Count Two

Generally, an employee has a duty of loyalty to his or her employer— " 'an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.' " *Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486, 492 (Colo. 1989) (quoting Restatement (Second) of Agency § 387 (1957)). One facet of the duty of loyalty is a duty not to compete with the employer concerning the subject matter of his or her employment. *Id.* at 492–3. Thus, for example, prior to the termination of his or her employment, an employee may not solicit customers for a rival business or solicit co-employees to join him or her in the competing business. *Id.* at 493–4. An employee is, however, "privileged" to prepare or make arrangements to compete with his/her employers prior to leaving. *Id.* at 493. Whether an employee's actions constitute a breach of his or her duty of loyalty is generally a question of fact based on consideration of all the circumstances of the case. *Id.* at 494; *Graphic Directions, Inc. v. Bush,* 844 P.2d 1190, 1194 (Colo. Ct. App. 1992) (in light of trial court's determination that circumstantial evidence would permit an inference that employees solicited customers prior to terminating their employment, trial court would have erred in resolving issue as one of law on motion for directed verdict and judgment notwithstanding the verdict), *vacated and remanded on other grounds,* 855 P.2d 448 (Colo. 1993).

Wells Fargo claims Defendants breach their duty of loyalty as follows: (1) deleting emails; (2) intentionally rejecting Molycorp's business (the bond) that Wells Fargo could have serviced; (3) recruiting and soliciting each other to leave Wells Fargo for McGriff; (4) taking trade secrets when they left Wells Fargo; and (5) acting in concert to coordinate simultaneous resignations to impair Wells Fargo's ability to negotiate and retain the many expiring accounts. Defendants argue Wells Fargo has no evidence to support such claims; deleting of emails was not alleged in the Verified Complaint; and Mr. McQuate testified that he believed it was in the best interest of the client as the bond had already been sold.

*Emails.* Starting with the deletion of emails, the Court agrees the evidence is insufficient that any such deletion occurred. The fact that Wells Fargo believes there should be more emails, without more, does not support a finding that Defendants deleted such emails prior to departure.

*Molycorp.* Next, as to Molycorp, the evidence shows that in early August 2014, shortly before his resignation, Mr. McQuate received notice that the bond was up for renewal in September 2014. He testified he basically had about two weeks to take care of it, and decided it was best to have Molycorp go to USI to handle the renewal. The evidence is unclear as to why Mr. McQuate could not handle the renewal within the time frame, and Mr. Lindstrom has testified to the contrary—that Wells Fargo could have serviced the renewal. And, the evidence shows that, at McGriff, Mr. McQuate (and the other Defendants) wanted Molycorp's business. On this record, the Court is unable to find that no reasonable jury could find in favor of the nonmovant, Wells Fargo, on this issue.

*Solicitation and En Mass Departure of Employees.* In determining whether an employee's actions amount to impermissible solicitation of co-workers, the court should focus on the following factors: "the nature of the employment relationship, the impact or potential impact of the employee's actions on the employ-

er's operations, and the extent of any benefits promised or inducements made to co-workers to obtain their services for the new competing enterprise." *Jet Courier*, 771 P.2d at 497. "No single factor is dispositive." *Id.* The court's focus is on whether the employee acted "solely" for the employer's benefit in all matters connected with his or her employment, and whether the employee competed during his or her employment, given due regard to the employee's right to make preparations to compete. *Id.* at 492–3

An examination of the case law shows determining whether an employee has breached a duty of loyalty to his or her employer is generally a fact-intensive inquiry. *See, e.g., Koontz v. Rosener*, 787 P.2d 192 (Colo. 1989) (trial court's determination—after trial—that employees (real estate salespersons) violated a duty of loyalty affirmed where trial court found, *inter alia*, employees had gained trust and confidence such that they were permitted to engage in activities in largely independent fashion; had acted in concert to conceal their plan to simultaneously leave the employer; had listed properties for only a short period so that potential listings would be prospectively available for their competing venture; and had comprised about one-half of employer's entire sales staff and were responsible for the bulk of the sales and listing activities); *Lucht's Concrete Pumping, Inc. v. Horner*, 224 P.3d 355 (Colo. App. 2009) (affirming trial court's conclusion—after trial—that employee did not breach his duty of loyalty where trial court found no evidence that employee solicited customers or employees, or disclosed trade secrets or proprietary information; although there was some evidence that employee was involved in assessing competitor's equipment needs, trial court found the extent of such communications was minimal), *rev'd on other grounds*, 255 P.3d 1058 (Colo. 2011). The Court finds this case is no different.

■ Here, upon consideration of the evidence presented by the parties, the Court finds Defendants not are entitled to judgment as a matter of law. For example, the record is far from clear that Defendants did not solicit each other to join McGriff, in light of the differences (or contradictions) in testimony as to who told whom about McGriff (and what and when) and Ms. Wong's negotiations of compensation on behalf of all Defendants as part of a package deal for the "team" or "group." Nor is it clear that Defendants' en masse resignation on the same date had no impact or potential impact on the employer's operations, especially in light of upcoming renewals and because they were Wells Fargo's mining "team." Defendants were responsible for approximately 80% of Wells Fargo's mining accounts nationally. Finally, Defendants argue their resignations on August 22, 2016 were "coincidental" and their differences in testimony results from the lapse of time. On the record at hand, a reasonable jury may find otherwise. Accordingly, the Court finds summary judgment may not be had.

■ *Trade Secrets*. Relying on *Powell Prods., Inc. v. Marks*, 948 F.Supp. 1469, 1474 (D. Colo. 1996), Defendants argue—without analysis—that the Uniform Trade Secrets Act preempts common law claims based on the same operative facts as the claim for misappropriation of trade secrets. Wells Fargo did not address this argument, but, nonetheless, the Court is not persuaded—on this record—that the breach of loyalty claim is preempted. *See Marks*, 948 F.Supp. at 1474 ("Preemption is only appropriate where other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation."; internal quotation marks and citation omitted). Nonetheless, the Court finds the evidence is insufficient to show that any trade secrets were taken—

physically—by Defendants, other than the document containing the list of USI accounts sold taken by Mr. McQuate. The fact that this information—because it is now disseminated publicly in this case—is no longer a trade secret, does not negate a finding that a breach of loyalty occurred. *See Marks,* 948 F.Supp. at 1474 (recognizing that, even if a plaintiff claims certain information constitutes trade secrets, its claim may not depend on that determination).

### D. Misappropriation of Trade Secrets—Count Three

"Under Colorado law, to prove misappropriation of a trade secret, a plaintiff must show: (i) that he or she possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 847 (10th Cir. 1993). Defendants argue (1) the information belongs to the client and does not constitute "trade secrets"; and (2) even if trade secrets did exist, there is no evidence of misappropriation, as there is no evidence that Defendants used or disclosed Wells Fargo's trade secrets or confidential information. Wells Fargo argues (1) Mr. McQuate admitted he memorized trade secrets and retained a hard copy of trade secrets (the USI information); and (2) the record contains reasonable inferences suggesting Defendants Wong and Prouty also memorized some of Wells Fargo's trade secrets and used them to identify, target, and successfully solicit Wells Fargo's clients.

As previously discussed, the trade secrets claimed are not as limited as Defendants argue, and Wells Fargo has sufficiently shown it has trade secrets which Defendants had access to and knew of during their employment, e.g., the CRIP reports. Mr. McQuate admits knowing some of this trade secret, such as the contacts for such customers and where they reside. Mr. McQuate testified he knew some of this information on certain accounts because they were the accounts he handled. Ms. Wong and Mr. Prouty have made no such admissions, but the Court agrees that the record shows a reasonable inference may be drawn that these Defendants also retained some of this information. For example, between Friday, August 22, 2014 and Monday, August 25, 2014, Ms. Wong sent Mr. Hansen, General Counsel for ADA Carbon, to connect with her on LinkedIn. Ms. Wong knew Mr. Hansen was Wells Fargo's contact because she had worked with him while at Wells Fargo.

Of course, there is still the issue of whether Defendants used or disclosed such information. The Court agrees the mere fact that clients of Wells Fargo subsequently became clients of McGriff does not mean that Defendants used or disclosed trade secrets. *See American Fam. Mut. Ins. Co. v. Gustafson,* No. 08-cv-02772-MSK, 2011 WL 782574, at *5–6 (D. Colo. Feb. 25, 2011). But, that is not all the evidence Wells Fargo has to support this claim. Here, for example, there is evidence that Ms. Wong knew whom to reach out to at ADA Carbon because she acquired this information from Wells Fargo, and Mr. Prouty knew whom to reach out to at Coeur Mining based on information acquired at Wells Fargo. Defendants' contacts with Molycorp raise similar issues. In the Court's view, on this record, that is no different from an employee using an employer's customer list to reach out to those customers in order to acquire their business. Accordingly, summary judgment is inappropriate as to any Defendants.[20]

**20.** See footnote 9, *supra.*

### E. Unfair Competition—Count Four

"[T]he tort of unfair competition requires, first, that the defendant has copied the plaintiff's products or services or misappropriated plaintiff's name or operations in some regard, and second, that this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services." *NetQuote, Inc. v. Byrd*, 504 F.Supp.2d 1126, 1131 (D. Colo. 2007). Wells Fargo relies on an "unfair misappropriation and the exploitation of a competitor's business values" (ECF No. 64) in support of its claim. Among other things, Defendants argue Wells Fargo has presented no evidence that the public has been deceived by Defendants. The Court agrees. The only evidence presented by Wells Fargo arguably in support of this issue is hearsay that Defendants allegedly made misrepresentations concerning Wells Fargo's mining business. Such evidence, however, is insufficient to defeat summary judgment. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209 (10th Cir. 2010) (court is constrained to disregard hearsay on summary judgment where there is a proper objection and the proponent fails to direct the court to any applicable exception). Accordingly, summary judgment in favor of Defendants is proper on this claim.

### F. Conversion—Count Five

To establish a claim for conversion, a plaintiff must show that: (i) defendant exercised dominion or control over property; (ii) that property belonged to plaintiff; (iii) defendant's exercise of control was unauthorized; (iv) plaintiff demanded return of the property; and (v) the defendant refused to return it. *L–3 Commc'ns Corp. v. Jaxon Eng'g & Maint.,*

*Inc.*, 863 F.Supp.2d 1066, 1081 (D. Colo. 2012); *see Itin v. Ungar*, 17 P.3d 129, 135 n.10 (Colo. 2000). Defendants argue Wells Fargo's claim fails because (1) it lacks factual support, and (2) it is preempted. As the Court finds there is insufficient support for this claim, it need not consider the other basis raised.

Specifically, Wells Fargo argues its conversion claim is premised on Defendants' deletion of emails and/or failing to return hard copy records created in the course of their employment. As previously stated, Wells Fargo has presented insufficient evidence that Defendants deleted any emails. And, as for the hard copy of records, Wells Fargo has failed to show any such records were taken, other than the document containing information about the USI sale in Mr. McQuate's possession.[21] Nonetheless, no damages have been shown. As previously discussed, the document is now a matter of public record and there is no evidence that Mr. McQuate used the information in the document. *See Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 n.6 (Colo. 1994) (measure of damages for conversion is value of converted property plus interest from the time of conversion until trial). Accordingly, summary judgment in favor of Defendants should be granted on this claim.

### G. Tortious Interference with Prospective Business Advantage and Intentional Interference with Contractual Relationships— Counts Six and Seven

In order to establish a claim for tortious interference with prospective business advantage, a plaintiff must show (1) that defendant either induced a third person not to enter into or continue a

---

**21.** Further, from the record, it appears this document may have been returned to Wells Fargo.

contractual relationship with plaintiff, or prevented plaintiff from acquiring or continuing the prospective relation; (2) that defendant did so intentionally; and (3) that defendant used improper means to do so. *L-3 Commc'ns Corp.*, 863 F.Supp.2d at 1085–86 (citing *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. Ct. App. 2007)); Restatement (Second) of Torts § 766B (1979). Similarly, for a claim of intentional interference with contract, a plaintiff must show: (1) plaintiff had a contract with a third-person; (2) defendant knew or reasonably should have known of the contract; (3) defendant intentionally caused the third-person not to perform or terminate his/her contact contract or interfered with the third-person's performance of a contract causing the third-person not to perform or to terminate the contract; (4) defendant's interference was improper; and (5) defendant's interference with the contract caused plaintiff damages. *See Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1117 (Colo. 1990); Colo. Jury Instruction 4th Civil 24:1 (2016).

Defendants contend no liability exists here because (1) they have not solicited Wells Fargo's customers or employees; (2) they have not misappropriated any of Wells Fargo's trade secrets or confidential information; (3) there is no evidence of any contracts between Wells Fargo and its clients; and (4) they are not liable for any interference with each other's non-compete agreements as such agreements are not valid and, if they are, Defendants have complied with them. Wells Fargo argues that Defendants rest on the absence of evidence of solicitation, misappropriation of trade secrets, and invalidity of the agreements, but Wells Fargo has shown otherwise. The Court agrees, in part.

Defendants' argument is based on prevailing on their other arguments, but, as stated above, summary judgment is not appropriate as to all Defendants on all claims. Specifically, as relevant to Defendants' arguments, Wells Fargo has presented sufficient evidence to go forward on the following: (1) breach of contract for use/disclosure of confidential information and trade secrets; (2) breach of contact for improper solicitation of Cloud Peak Energy (Ms. Wong), ADA Carbon (Ms. Wong), and Molycorp (all Defendants); (3) misappropriation of trade secrets against all Defendants; and (4) that the employment agreements are valid, and a reasonable jury may find they have been breached. In addition, the Court finds sufficient Wells Fargo's evidence that it had a fee agreement with Cloud Peak and Wells Fargo was required to refund part of this fee after Cloud Peak changed its Broker of Record. Accordingly, Wells Fargo may move forward on these intentional interference claims, but only as follows: (1) tortious interference with prospective business advantage—as to Cloud Peak Energy (Ms. Wong), ADA Carbon (Ms. Wong), and Molycorp (all Defendants); (2) tortious interference with prospective business advantage against all Defendants—as to their respective employment agreements with Wells Fargo; (3) intentional interference with contractual relationship against Ms. Wong—as to Cloud Peak Energy; and (4) intentional interference with contractual relationship against all Defendants—as to their respective employment agreements with Wells Fargo. Defendants' motion for summary judgment is otherwise granted as to Counts Six and Seven.

**H. Civil Conspiracy—Count Eight**

■ To establish a civil conspiracy claim, Wells Fargo must prove "(1) two or more persons ....; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Jet*

*Courier*, 771 P.2d at 502. Here, Defendants argue Wells Fargo cannot establish this claim because it is a derivative claim and Wells Fargo's overt acts are those discussed above (e.g., alleged solicitation of customers and each other), which it has not established. As discussed above, Wells Fargo has presented sufficient evidence on some of its claims. Nonetheless, because all bases for all claims were not sufficient, the Court will examine the conspiracy claim in light of what remains.

In the Verified Complaint, Wells Fargo asserts the following in support of its conspiracy claim:

> Defendants have engaged in concerted action to cause each other to breach their duties of loyalty to Wells Fargo, to breach their contracts with Wells Fargo, to tortuously interference with Wells Fargo's prospective economic advantage as well as its contractual and business relationships with its employees and with its clients, to misappropriate Wells Fargo's Confidential Information and Trade Secrets, to unfairly compete with Wells Fargo, and to convert Wells Fargo's Confidential Information and Trade Secrets to their possession[.]

(ECF No. 1, ¶ 106.) As discussed above, certain portions of Wells Fargo's claims may go forward as to *all* Defendants: (1) the breach of duties of loyalty (regarding Molycorp, solicitation, and en masse departure); (2) the breach of employment contracts (as to the disclosure/use of confidential information or trade secrets); (3) the tortious interference with prospective business advantage as to Molycorp; (4) the tortious interference with contractual relationship as to the employment agreements; and (5) the misappropriation of trade secrets. And, although the Court finds certain claims are sufficient to go forward against Ms. Wong related to Cloud Peak Energy and ADA Carbon, and against Mr. McQuate related to the notes, there can be

no conspiracy where there is only one actor involved. Moreover, the Court finds summary judgment should be granted in favor of Defendants on the underlying claims for unfair competition and conversion; therefore, these claims cannot serve as a basis for the conspiracy claim. Accordingly, any conspiracy claim based on the following may not go forward: (1) tortious interference with prospective business advantage—as to Cloud Peak Energy (Ms. Wong) and ADA Carbon (Ms. Wong); (2) intentional interference with contractual relationship against Ms. Wong—as to Cloud Peak Energy; (3) unfair competition; and (4) conversion. Summary judgment is, therefore, granted in part and denied in part to this claim.

## IV. CONCLUSIÓN

Based on the foregoing, the Court **ORDERS** that Defendants' Motion for Summary Judgment (ECF No. 57) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) First Count for Breach of Contract: summary judgment is **denied in part and granted in part** as stated herein;

(2) Second Count for Breach of Duty of Loyalty: summary judgment is **denied in part and granted in part** as stated herein;

(3) Third Count for Misappropriation of Trade Secrets: summary judgment is **denied** as stated herein as to all Defendants;

(4) Fourth Count for Unfair Competition: summary judgment is **granted** as to all Defendants;

(5) Fifth Count for Conversion: summary judgment is **granted** as to all Defendants;

(6) Sixth and Seventh Count for Tortious Interference with Prospective Business Advantage and Intention-

al Interference with Contractual Relationships: summary judgment is **denied in part and granted in part** as stated herein; and

(7) Eighth Count for Civil Conspiracy: summary judgment is **denied in part and granted in part** as stated herein.